UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | . |
| | . Criminal Action |
| VERSUS | . No. H-05-CR-351 |
| | . |
| DONG DANG HUYNH and US TOURS, | . Houston, Texas |
| | . July 10, 2008 |
| Defendants. | . 9:15 a.m. |

. . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MELINDA HARMON
AND A JURY

APPEARANCES:

FOR THE UNITED STATES OF AMERICA:

Mr. Joseph C. Magliolo
Mr. Jason Varnado
Assistant United States Attorneys
UNITED STATES ATTORNEY'S OFFICE
910 Travis, Suite 1500
Houston, Texas 77002
713.567.9300

FOR THE DEFENDANTS:

Mr. Richard Haynes
Mr. John V. Singleton
Ms. Loi Phan
RICHARD HAYNES & ASSOCIATES, PC
314 North Post Oak Lane
Houston, Texas 77024
713-868-1111

**VOLUME 9 OF 15**

PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION

COURT REPORTER:

GAYLE L. DYE, CSR, RDR, CRR
515 Rusk, Room 8016
Houston, Texas 77002
713.250.5582

## INDEX OF WITNESSES

| | Page |
|---|---|
| FOR THE GOVERNMENT: | |
| **DUC DANG HUYNH** | |
| CROSS EXAMINATION BY MR. HAYNES | 4 |
| **WILLIAM WU** | |
| DIRECT EXAMINATION BY MR. MAGLIOLO | 146 |
| CROSS EXAMINATION BY MR. HAYNES | 153 |

PROCEEDINGS

July 10, 2008

THE COURT: Are we ready for the witness?

MR. VARNADO: Yes, Your Honor. Last night there was a substitute translator available, and so we're going to continue with the witness.

THE COURT: All right.

(The witness, **DUC DANG HUYNH**, called on behalf of the Government, was previously sworn and testified through an interpreter.)

THE COURT: Mr. Huynh, you're still under oath from yesterday.

MR. VARNADO: And Your Honor, may I ask that the Defendant (sic) be unrestrained so that he may --

THE COURT: Yes, you may do that.

MR. VARNADO: -- handle documents and such?

MS. PHAN: Your Honor, before we proceed, has the translator been sworn?

THE COURT: Yes. The translator was sworn earlier, yes.

(Discussion off the record between Mr. Haynes and Ms. Phan.)

THE COURT: She was sworn when she signed her contract.

MS. PHAN: Okay, sorry.

09:17:34
THE COURT: Now, are you ready to cross examine, Mr. Haynes?

MR. HAYNES: I thought they still had him on direct, Your Honor.

THE COURT: I thought they passed the witness.

MR. VARNADO: We passed the witness, Your Honor.

MR. HAYNES: Oh, all right. Thank you.

CROSS EXAMINATION

BY MR. HAYNES:

09:17:44
**Q** Mr. Huynh, you do speak some English?
**A** Yes, I do.
**Q** In fact, when you had your first interview with the prosecutors here, you agreed to conduct it in English, did you not?

09:18:05
**A** No. I had a translator at that time. I did in Vietnamese.
**Q** Did you tell them that you did not want to do the first interview in English?
**A** Yes, I did.
**Q** I believe you told the Court and the jury that you were born in Vietnam. What year?

09:18:38
**A** 1971.
**Q** And you knew Dong Huynh in Vietnam?
**A** Yes.
**Q** He was kinfolks to you?

09:19:06
**A** Yes.

**Q** Did you-all live in the same neighborhood?
**A** Yes.
**Q** Were you there in Vietnam when Dong tried to leave the first time?
09:19:24 **A** Yes, I did.
**Q** And were you aware, did you know, that the Vietnamese military, the communist military, struck him in the ear with a rifle and caused him to lose the hearing in his ear? Do you remember that?
09:20:01 **A** I did not know.
**Q** Have you since had time to learn that he is totally deaf in one ear?
**A** No.
**Q** When you came to the United States, I believe you told our 09:20:22 jury that you became a student?
**A** Yes.
**Q** And you went to City College in San Francisco?
**A** Correct.
**Q** And who did you live with at the time when you were going 09:20:46 to City College in San Francisco?
**A** I stay with Uncle Dong.
**Q** In San Francisco?
**A** In Oakland.
**Q** I thought you said you went to college in San Francisco. 09:21:07 Was I wrong?

**A** Yes, that's correct. I attended City College.
**Q** In San Francisco?
**A** Correct.
**Q** My question was who did you live with when you were going
09:21:26 to the City College in San Francisco?
**A** I live with my Uncle Dong in Oakland.
**Q** All right. Did -- was anybody else living with you and your Uncle Dong when you went to City College?
**A** Older brother of Uncle Dong and his wife and the two
09:22:07 cousins.
**Q** The older brother's name was what?
**A** Dong's older brother's name Tam, T-a-m.
**Q** And who else did you live with there when you were going to City College?
09:22:39 **A** And the two children of Uncle Tam.
**Q** How long did you live with Dong and Tam in Oakland?
**A** About six months.
**Q** And then, where did you move to?
**A** And then, I move to Newark.
09:23:17 **Q** And I notice you started answering my question before the translator translated it for you. So you understood my question?
**A** A little bit.
**Q** A little bit?
09:23:42 **A** Correct, sir.

09:24:07 09:24:32 09:24:55 09:25:35 09:25:59

**Q** All right. In Newark who did you work for?
**A** I did not work anywhere.
**Q** How long did you live in Newark?
**A** About three years.
**Q** And you didn't work?
**A** I attended Mission College in Santa Clara.
**Q** And did you get a degree from Mission College in Santa Clara?
**A** No.
**Q** Did -- were the classes taught in English in Santa Clara?
**A** Correct.
**Q** Did you make passing grades in the courses you took while you were there at Santa Clara?
**A** All the class I took was English classes.
**Q** My question probably wasn't clear. Did you make passing grades in English?
**A** I haven't passed those grade.
**Q** You mean you went three years to Mission College and you flunked every course you took in English?
**A** Correct, sir.
**Q** And they permitted you to continue to go to school?
**A** Correct, sir.
**Q** And you were here in the United States on a student visa, were you not?
**A** Yes.

**Q** And when did you change that student visa to some other kind of visa?
**A** 2001.
**Q** And where were you living when you changed the student visa 09:26:17 to some other type of visa?
**A** I was in Newark.
**Q** Newark?
**A** Correct, sir.
**Q** California?
09:26:32 **A** California.
**Q** Were you in school at the time, at the Mission College?
**A** When I changed the visa, I stop attending school.
**Q** Now, you changed the visa by marrying a person who was a United States citizen; isn't that true?
09:27:07 **A** Correct, sir.
**Q** And what was that citizen's name that you married in order to change your visa?
**A** I'm not clear about the question, sir.
**Q** Sure. What was the name of the person that you married in 09:27:34 order to change your visa?

MR. VARNADO: Object to the question as argumentative as stated.

THE COURT: Sustained.

Rephrase your question, please.

09:27:41 //

BY MR. HAYNES:
**Q** What was the name of the person that you married when you got your visa changed from student visa to something else?
**A** Mai Vivian; M-a-i, Vivian.
09:28:05 **Q** Is the first name Mai or the last name Mai?
**A** (In English.) Last name is Mai.
THE INTERPRETER: The last name is Mai, M-a-i.
BY MR. HAYNES:
**Q** And what did they change your visa to when you married
09:28:31 Vivian Mai?
**A** I'm not clear.
**Q** Is the question not clear?
**A** No. I'm not sure when I changed from the student visa to the visa that I get married, to get a resident visa. I'm not
09:29:05 sure what the difference between the visa.
**Q** After you married Vivian Mai, you got a different kind of visa, did you not?
**A** I don't know, sir.
**Q** You don't know.
09:29:26 Do you know what kind of a visa you had when you were arrested and placed in jail?
**A** No.
**Q** You're still saying that you're married to Vivian Mai, are you not?
09:29:49 **A** On paper we are still married.

**Q** On paper?
**A** Correct, sir.
**Q** You never lived with Vivian Mai as her husband?
**A** Only three months.
09:30:21 **Q** Did you marry her on paper in order to change your visa status?
**A** That's not correct.
**Q** Well, you're still contending that you're married to Vivian Mai, are you not?
09:30:43 **A** Correct.
**Q** But you don't live with her?
**A** No.
**Q** You actually have another wife since you've been -- since you came to Houston to run US Tours, did you not?
09:31:03 **A** Correct, sir.
**Q** So the reason why you married Vivian Mai was simply to change the visa?
**A** That's not correct.
**Q** You never have changed it, have you?
09:31:35 THE INTERPRETER: Would you clarify?
MR. HAYNES: Yes.
BY MR. HAYNES:
**Q** You never have changed that visa showing that you're married to a US citizen, have you, sir?
09:31:45 **A** It did change.

**Q** It did change?
**A** Correct, sir.
**Q** Well, did you file US tax returns in 2003 showing that you at the time was still married to Vivian Mai?
09:32:12 **A** I did.
**Q** And that wasn't true, was it?
**A** I was still married with her, then I still file income tax.
**Q** But you were living with the other lady that you called your wife?
09:32:35 **A** Correct.
**Q** What's the lady that you've been living with that you call your wife, what's her name?
**A** T-h-u is the first name.
**Q** And what last name does she go by?
09:32:58 **A** Last name is Phan, P-h-a-n.
**Q** Now, when you came to Houston to work for US Tours --
**A** Correct, sir.
**Q** -- you bought a house?
**A** Correct.
09:33:24 **Q** And when did you buy the house, please?
**A** Around June, 2003.
**Q** And did you buy it in your name or in the name of you and Thu Phan?
**A** My name.
09:33:55 **Q** Did you tell the people that you bought the house from that

you were married to Thu Phan?
**A** No.
**Q** Did you tell them you were married to Vivian Mai?
**A** No.
09:34:13 **Q** And then, you and Ms. Thu Phan had children together?
**A** Yes.
**Q** How many?
**A** Two.
**Q** Now, did Thu Phan go to work for US Tours when you were here running it?
09:34:34
**A** Yes.
**Q** And did -- was she supposed to be working for US Tours at a time when she had children?
**A** When we moved to Houston, Thu only work in February and March of 2004.
09:35:11
**Q** She only worked in February and March of 2004?
**A** Correct.
**Q** But she was on the payroll of US Tours in Houston, was she not?
09:35:33 **A** Correct.
**Q** Now, when counsel for the prosecution asked you how much you got paid, you told him how much you got paid, did you not?
**A** Correct.
**Q** How much did she get paid, your wife?
09:35:51 **A** I don't remember.

**Q** You don't remember what your wife got paid?
**A** I don't remember.
**Q** Are you still married to the lady named Thu Phan?
**A** Yes.
09:36:12 **Q** Were you married to her at the time you pled guilty and were locked up as a consequence of your participation in various activities?
**A** I never been married to her.
**Q** Have you ever told anybody that you were married to her?
09:36:37 **A** I live with her.
**Q** My question probably wasn't clear. Have you ever told anybody that she was your wife, Thu Phan?
**A** Yes.
**Q** Well, when you told them she was your wife, whoever you told that to, you didn't tell them the truth, did you?
09:37:04
**A** That's not -- that's not it.
**Q** That's not it? When you said -- I'm sorry, that's not right?
**A** Not right.
09:37:28 **Q** When you told people that Thu Phan was your wife, you didn't tell them the truth, did you?
**A** I don't think so.
**Q** You don't think you told them the truth?
**A** What I told was the truth.
09:37:57 **Q** What you told was the truth?

09:38:30 09:39:03 09:39:28 09:39:51 09:40:30

**A** I told that she's my wife.
**Q** Doesn't that mean to you, if you tell somebody Thu Phan is your wife, that you're married to her?
**A** Could you rephrase that? I don't understand the question.
**Q** Sure. When you told people Thu Phan was your wife --
**A** Correct.
**Q** -- you were telling them that so that they would think that she was your wife?
**A** I don't understand what that question means.
**Q** Sure. Well, the two of you lived together after you came to Houston and bought a house?
**A** Correct.
**Q** And you had children together. She was the mother; you were the father. What last name did you give those children, yours or hers?
**A** My last name.
**Q** So that's when you're still here in the United States as a consequence of being married to a US citizen by the name of Vivian Mai, are you not?
**A** Correct.
**Q** So all this time that you've been claiming to be married to Vivian Mai, you've been living with Thu Phan and claiming that she was your wife, correct?
**A** Correct.
**Q** Did you ever tell the special agent here that you had

worked a scheme by marrying an American -- an American citizen but not living with her? Did you ever tell him that you had worked a scheme by marrying Vivian Mai?

**A** No.

09:41:16 **Q** Do you recognize that you could be deported as a consequence of endeavoring to work a fraud on the United States Government?

**A** Would you rephrase that, please?

**Q** You know you're working a fraud on the United States
09:41:48 Government?

**A** Could you spell what is fraud, what did I do?

**Q** Well, you got a visa change by marrying an American citizen?

**A** I don't think that's a fraud.

09:42:24 **Q** She's married -- Vivian Mai is married to somebody else, is she not?

THE INTERPRETER: Excuse me?

BY MR. HAYNES:

**Q** Vivian Mai is married to someone else, not you, is she not?

09:42:41 **A** I don't know.

**Q** How long has it been since you've seen Vivian Mai?

**A** Since I moved to Houston.

**Q** Does Vivian Mai know that you moved in with Thu Phan?

**A** Yes.

09:43:02 **Q** And that you have two children by Thu Phan?

**A** Yes, I did.
**Q** Did you pay any money to Vivian Mai in order to show that you're her husband and get your visa changed?
**A** No.
**Q** Have you paid her any money since then?
**A** No.
**Q** Did she know that you put her name on your income tax return as being your wife in 2003?
**A** Yes, she did.
**Q** She knew it?
**A** Yes, she know.
**Q** And she approved?
**A** Correct.
**Q** How about Thu Phan, did she file a tax return in 2003?
**A** I think she did. She must.
**Q** Well, did she show you as being her husband on that tax return that she filed in 2003?
**A** No.
**Q** What did she show was her income on the tax return that she filed in 2003 where she did not show you as being her husband?
MR. VARNADO: Your Honor, I just object to the relevance of this.
THE COURT: Sustained.
MR. HAYNES: If the Court please, he asked him what his income was and did not go into what the wife's --

THE COURT: He said he didn't know what her income was. So the question has been asked and answered, essentially. So let's keep going.

MR. HAYNES: I didn't hear that. I apologize, Judge.

09:45:14 BY MR. HAYNES:

**Q** You don't know what her income was; is that right?

**A** No.

**Q** Do you know what she was supposed to be making when she worked for US Tours?

09:45:23 MR. VARNADO: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. HAYNES:

**Q** You know that her record as an employee for US Tours was kept by Mr. Sinh in California, was it not?

09:45:39 **A** How would I know?

**Q** Did she get a check every month from US Tours in California for her employment there?

**A** I thought so.

**Q** You thought so?

09:46:05 **A** Correct, sir.

**Q** Because you saw her at work at US Tours when you were working there, did you not?

**A** Correct, sir.

**Q** Okay. So are you saying that she only worked at US Tours

09:46:28 two months out of the whole time that you were in Houston and

before you got arrested?
**A** That's correct.
**Q** And during that period of time, what did she do at US Tours as an employee?
09:46:43 **A** Transferring money.
**Q** She transferred money?
**A** Receiving money from the clients.
**Q** And did she -- when she received -- let me take you back to when you were operating US Tours. When did you start running US
09:47:10 Tours here in Houston? When did you become the manager?
**A** July, 2003.
**Q** But you were working there before July, 2003, were you not?
**A** No.
**Q** Okay. So your first paycheck ought to be for July, 2003,
09:47:45 according to Mr. Sinh's records; is that true?
**A** From Houston?
**Q** From Houston. US Tours in Houston.
**A** Correct. It started July.
**Q** All right. Now, you knew that Mr. Sinh kept the records
09:48:18 for US Tours not only in Houston but for the rest of the agencies around the United States, did you not?

MR. VARNADO: Objection. That assumes facts not in evidence.

THE COURT: Sustained. Just rephrase it, please.

09:48:29 //

BY MR. HAYNES:
**Q** You knew that US Tours had agents in other cities other than Houston, did you not?
**A** Correct.
09:48:44 **Q** Okay. So it wasn't a surprise to you that I mentioned that in my question, is it, sir?
MR. VARNADO: Object to the form of the question, Your Honor. It's not even a question.
THE COURT: Sustained.
09:49:07 BY MR. HAYNES:
**Q** You told the prosecutor that you were paid $2500 a month and that you worked from 7:00 a.m. in the morning to 7:00 p.m. at night seven days a week. Do you remember telling our jury that?
09:49:21 **A** Correct.
**Q** What time in the morning did US Tours in Houston open?
**A** 7:00.
**Q** Didn't it have a sign on the door saying it opened at 8:00?
**A** Yes.
09:49:50 **Q** But it opened at 7:00?
**A** Correct.
**Q** And did you open the store every morning while you were the manager here in Houston?
**A** Correct.
09:50:07 **Q** How many employees did you have working for you during the

period of time you were the manager of US Tours in Houston?
**A** Three.
**Q** And did they stay working with you the entire time you were the manager of US Tours in Houston?
09:50:33 **A** Correct.
**Q** And what's the name of the one who worked there the longest?
**A** The longest one was Minh Bui. M-i-n-h is the first name; Bui, B-u-i, is the last name.
09:51:04 **Q** Is that a boy or girl?
**A** Girl.
**Q** And what's the name of the next person who worked there with you at US Tours when you were the manager?
**A** His first name is Thong, T-h-o-n-g. I don't remember the
09:51:28 last name.
**Q** And how long did -- was Thong a man or a woman?
**A** Man.
**Q** And how long did Thong work for you when you were the manager of US Tours in Houston?
09:51:50 **A** I don't remember.
**Q** Was he working at US Tours in Houston when you became the manager?
**A** Not yet.
**Q** When did he go to work, do you recall?
09:52:11 **A** I don't remember.

09:52:36
09:53:21
09:53:46
09:54:11
09:54:28

**Q** Was he still working for you when you got arrested?
**A** Yes, he still.
**Q** And what's the name of the third person that you said worked there while you were the manager of US Tours in Houston?
**A** Dong Phan. D-o-n-g is the first name; Phan, P-h-a-n, is the last name.
**Q** Now, did you ever tell Mr. Sinh in California that Dong Phan was an employee of US Tours in Houston, just "yes" or "no"?
**A** No.
**Q** When did Dong Phan go to work for you at US Tours in Houston?
**A** Around September, 2003.
**Q** Did you pay him his salary out of the money you made?
**A** No.
**Q** And what were his hours, Dong Phan?
**A** 7:00 a.m. to 7:00 p.m.
**Q** And if you didn't turn his name in to Mr. Sinh in California, who paid him?
**A** My Uncle Dong, D-o-n-g.
**Q** Your Uncle Dong, the man sitting over here, paid Dong Phan, is that what you're saying?
**A** Correct.
**Q** And you saw that?
**A** Yes, I did.
**Q** How did he pay him, by check?

09:55:04 09:55:46 09:56:15 09:56:34 09:57:03

**A** Cash.
**Q** Because you know that there ain't one check in Mr. Dong Huynh's banking records made payable to Dong Phan, don't you?
**A** I think so.
**Q** You think so what?
**A** Because my Uncle Dong paid him cash. Then, it wouldn't appear anywhere.
**Q** So there's no checks -- you admit that there's no checks in Mr. Dong Huynh's checking accounts made payable to Mr. Dong Phan?
**A** How would I know?
**Q** Yes. You're the one who hired Mr. Dong Phan, are you not?
**A** I did not hire him.
**Q** Aren't you the one who offered him the job at US Tours?
**A** I never offer him anything.
**Q** Did he just show up one day and start to work at US Tours?
**A** That's not true.
**Q** You had talked to him before he went to work for US Tours, hadn't you?
**A** I talked to my Uncle Dong before he came to work for US Tours.
**Q** Did you talk to Dong Phan before he came to work for US Tours?
**A** I don't know what story you're talking about.
**Q** Yes. Well, isn't Dong Phan related to your -- the lady

that you live with, the mother of your two children?
**A** Correct.
**Q** And did Dong Phan move in with you and the lady you're living with as the mother of your two children?
09:57:33 **A** Correct.
**Q** And was he living with you before he became an employee of US Tours?
**A** Correct.
**Q** And it's your testimony that you talked to Dong Huynh
09:57:54 before Dong Phan became an employee of US Tours?
**A** Correct.
**Q** And you told Dong Huynh that you wanted -- what is it, your brother-in-law?
**A** Correct.
09:58:21 **Q** He's your brother-in-law?
**A** Correct.
**Q** And did you tell Dong Huynh that he was living with you?
**A** Yes, I did.
**Q** And did you tell him that you wanted Dong Phan to go to
09:58:41 work for US Tours?
**A** Yes, I did.
**Q** Did you know that during the period of time when you say that Dong Phan first started working for US Tours that the Government was wiretapping the conversations that Dong Huynh had
09:59:03 with anybody else? Did you know that?

THE INTERPRETER: Could you rephrase that, please?

MR. HAYNES: Sure.

BY MR. HAYNES:

**Q** You knew that the Government had wiretapped the conversations of Mr. Dong Huynh's phone, hadn't you?

09:59:14

**A** I did not know.

**Q** You found out, though, since the time you've been arrested that they did wiretap his phones, didn't you, sir?

**A** Correct.

09:59:44

**Q** Have you talked to anybody about the fact that the Government intercepted telephone calls?

**A** No.

**Q** Have you talked to Mr. Dong Phan since the time you've been arrested and charged in connection with your activities earlier on in this case?

10:00:15

**A** Yes.

**Q** Did he come to visit you while you were locked up?

**A** No.

**Q** Did he visit with you at the time when you were out on bond?

10:00:34

**A** No.

**Q** Was he still living with you and the lady that you lived with, the mother of your two children, at a time when you were out on bond?

10:00:56

**A** No.

Q Where is he now?
A He now live in Seattle.
Q And you know that because you've talked to him?
A Correct.
10:01:14 Q He called you?
A No.
Q You called him?
A Correct.
Q So you got his phone number from whom?
10:01:29 A From Thu, T-h-u.
Q Who is Thu, T-h-u?
A Thu is my wife.
Q Oh, your wife told you?
A Correct.
10:01:45 Q Now, which wife, the one that you -- the mother of your children?
A Correct.
Q Now, you and Mr. Dong Phan did some business on the side, did you not?
10:02:07 A No.
Q Never did?
A Never.
Q Did you ever have Mr. Dong Phan make any phone calls for you in connection with your business on the side?
10:02:29 A No.

10:02:58
10:03:27
10:03:56
10:04:15
10:04:28

**Q** Did Dong Phan know that you were doing business on the side?
**A** Yes.
**Q** Did you talk to him about it?
**A** No.
**Q** He knew about it because somebody told him?
**A** Because he work in the same office with me, I thought he would know.
**Q** You thought he would know that you were doing business on the side?
**A** Correct.
**Q** And how would he know from working in the office with you that you were doing business on the side?
**A** Because I usually met with the people that I work with.
**Q** You usually met with the people that you worked with?
**A** Correct.
**Q** And that's how Dong Phan knew that you were doing business on the side?
**A** Correct.
**Q** But you never told him?
MR. VARNADO: Objection. Asked and answered.
THE COURT: Sustained.
THE WITNESS: Never.
BY MR. HAYNES:
**Q** What other remittance company did you do business with on

the side?
**A** No.
**Q** You didn't do any business with any other remittance company?
10:04:50 THE INTERPRETER: Excuse me?
MR. HAYNES: Any other remittance company?
BY MR. HAYNES:
**Q** Do business? Did you send money anyplace through some other remittance company, "yes" or "no"?
10:05:09 MR. VARNADO: And Your Honor, if I just could object. I just want to make sure that the translator understands the word "remittance" in that business. Just in the way that counsel has phrased the question it does not cause some confusion.
10:05:22 THE INTERPRETER: No, I understand now.
MR. HAYNES: Do you understand?
THE INTERPRETER: Yes.
MR. HAYNES: If I use a word that you do not understand --
10:05:26 THE INTERPRETER: Right, sir.
MR. HAYNES: -- you'll let me know so we can straighten it out?
THE INTERPRETER: Yes.
BY MR. HAYNES:
10:05:32 **Q** You understood what I said, though, didn't you, Mr. Duc?

MR. VARNADO: Objection. Argumentative.

THE COURT: Sustained.

BY MR. HAYNES:

**Q** Did you understand what I said?

10:05:43 **A** No.

**Q** Well, you sent money for people that you didn't report to US Tours and Remittance; am I right?

**A** I'm not sure about the question.

**Q** Sure. Well, there was a man that came to see you when you

10:06:28 were the manager of US Tours and Remittance here in Houston --

**A** Correct, sir.

**Q** -- and asked you to send some money -- or have some money sent for him from California to Houston; isn't that correct?

**A** Correct.

10:06:57 **Q** And you later found out that that man was a cooperating witness for the FBI, didn't you?

**A** Correct.

**Q** And you -- when that man came to see you, what sum of money did he want you to help him transfer from California to some

10:07:24 other place?

**A** About 30,000.

**Q** And so you didn't tell Mr. Huynh -- Sinh about that, did you, in California?

THE INTERPRETER: Mr.?

10:07:42 //

BY MR. HAYNES:
**Q** -- Sinh, the man who kept the books?
**A** No.
**Q** You just called somebody in California, didn't you?
10:07:58 **A** Correct.
**Q** And who did you call in California to help you take this money to send this money from California to someplace else?
**A** I call one of my uncle named Truong Nguyen. Last name, Truong, T-r-u-o-n-g; first name, Nguyen, N-g-u-y-e-n.
10:08:32 **Q** Did you talk to him more than one time about sending money for you on the side?
**A** Correct.
**Q** How many times did you call your kinfolk there named Truong to get him to assist you to sending money somewhere?
10:09:03 **A** About two or three times.
**Q** About two or three times?
**A** Correct.
**Q** And of course, you did not fill out any paperwork at US Tours indicating you were doing that business, did you?
10:09:29 **A** No, I did not.
**Q** Did you agree to split some commission with Mr. Truong in California for his part in handling the money that the cooperating witness wanted you to move for him?
**A** No.
10:09:52 **Q** Did you pay Mr. Truong in California any money for

10:10:20
assisting you in moving money for the cooperating witness that came to see you two or three times?
**A** No.
**Q** Have you heard a telephone conversation that was an intercept between you and Mr. Truong? Did they play that for you?
**A** No.
**Q** Nobody's told you about it?
**A** No.

10:10:40
MR. VARNADO: Object. Assumes facts not in evidence.
THE COURT: Sustained.
MR. HAYNES: It's cross examination, if the Court please.
THE COURT: All right. I sustained the objection. Ask another question, please.

10:10:48
BY MR. HAYNES:
**Q** Were there two or three times that -- Truong is his name?
**A** Correct.
**Q** Assisted you in sending money?

10:11:01
Where did he send the money to?
**A** From California to Houston.
**Q** And did you tell him who would be bringing the money to him?
**A** Yes.

10:11:24
**Q** And did you tell him how much money would be brought to

10:11:40 10:12:16 10:12:47 10:13:03 10:13:20

him?
**A** Yes.
**Q** And did you tell him if you were going to charge the man who brought you the money initially a commission?
**A** Yes.
**Q** And how much commission were you charging this man who brought you the money that you called Truong on to get some help?
**A** I didn't pay anybody to bring the money to Mr. Truong.
**Q** I apologize to you. Did you charge the man who brought you the money a commission for helping him move the money from California to Houston, "yes" or "no"?
**A** Yes.
**Q** How much did you charge him?
**A** 1.8.
**Q** 1.8?
**A** Correct.
**Q** Is that what you charged him every time he came to see you the two or three times that you told our jury he came to see you?
**A** Sometime two point.
**Q** Sometimes two points?
**A** Correct.
**Q** Well, think of the first time that he came to see you. Do you remember the man that came in to see you at US Tours here in

Houston?
**A** Yes, I did.
**Q** Did you find out that his real name is Alan Golbert?
**A** I know only by Alan.
10:13:43 **Q** And when he came to see you in Houston, did he identify himself to you?
**A** Yes.
**Q** And did he tell you that he had money that he wanted moved from one place in the United States to another?
10:14:01 **A** Yes, he did.
**Q** And did you tell him that you could assist him for 1.8?
**A** I didn't tell him the first time.
**Q** When did you tell him that you were going to charge him a commission for moving the money?
10:14:29 **A** The second time then.
**Q** Did you charge him for the first time you helped him move money in the United States?
**A** Yes.
**Q** How much did you charge him for the first time?
10:15:02 **A** I don't remember.
**Q** You didn't turn the money you charged him in to US Tours, did you?
THE INTERPRETER: Would you rephrase him?
BY MR. HAYNES:
10:15:12 **Q** You did not charge him the money you charged him as

commission into US Tours, did you?
**A** No.
**Q** That was money you kept?
**A** Correct.
10:15:25 **Q** And did you split any of it with your kinfolk that you sent the man to in California, Truong?
**A** No.
**Q** Did you take money from the cooperating witness who brought you this money wanting to move it from California to Houston and
10:15:51 did you send it to Mr. Truong's brother in California?
**A** No.
**Q** Did you ever send any of the commission to Mr. Truong's brother, the dentist, in California?
**A** No.
10:16:37 **Q** Did you ever pay that man in California any money at all for helping you in this side business?
**A** No.
**Q** So he helped you three times?
**A** Correct.
10:16:58 **Q** And the first time involved how many dollars?
**A** I don't remember.
**Q** And the second time?
**A** Now, I don't recall those amounts.
**Q** And the third time?
10:17:29 **A** I don't recall.

10:17:40
10:17:53
10:18:20
10:18:47
10:19:07

**Q** Well, it was more than $5,000, wasn't it?
**A** Yes.
**Q** It was more than $10,000, wasn't it?
**A** More than that.
**Q** It was more than $20,000?
**A** More than that.
**Q** 30?
**A** More than.
**Q** 50?
**A** Yes, about that.
**Q** More than 50?
**A** Yes.
**Q** Over what period of time were you seeing this man Alan to help him send money from California to Houston?
**A** Seven, eight times.
**Q** Seven or eight times?
**A** Correct.
**Q** You mean Mr. Alan came to see you some seven or eight times?
**A** Correct.
**Q** And did you know that each time he came to see you he was wearing a tape recorder to record your conversation with him?
**A** That I would not know.
**Q** Have you determined since that time that he was recording your conversation?

10:19:27
10:19:50
10:20:24
10:21:01
10:21:21

**A** No.
**Q** You have learned since that time, though, that he was cooperating with the United States Government?
**A** Yes.
**Q** And what you did for him was against the law?
**A** Correct.
**Q** Now, in addition, do you know how much money you made off of Alan in the seven or eight times that he came to see you to get you to do business on the side?
**A** Over 10,000.
**Q** What year was it that Mr. Alan came to see you to get you to do business on the side?
**A** 2003.
**Q** And over what period of time did you continue to see him in 2003?
**A** About six months.
**Q** Where are the different places that he, Mr. Alan, wanted you to help him send money to from California?
**A** At my office.
**Q** Well, that's where he met you, at your office, isn't it?
**A** Correct.
**Q** And -- but he wanted you to send money for him from California to Houston? Didn't you say that?
**A** Correct.
**Q** That was the first time. Where did he want you to send

money to the second time?
**A** California to Houston.
**Q** Second time was to Houston, too?
**A** Correct.
10:21:41 **Q** And did Truong in California send the money to your office?
**A** No.
**Q** Did he send it to your home?
**A** No.
**Q** Had Mr. Alan given you an address for him to send it to?
10:22:00 **A** No.
**Q** So where did Mr. Truong in California send the money to?
**A** He kept in his office.
**Q** He didn't send the money from Mr. Alan?
**A** Well, he transferred. But in reality, the money, he still kept it with him.
10:22:44
**Q** Didn't he put some of the money in an envelope and just mail it to somebody for Mr. Alan?
**A** No.
**Q** So he kept the money in the office?
10:23:12 **A** Correct.
**Q** And where did he get the money to comply with Mr. Alan's request?
**A** Because I have money at my office and then I give it to Mr. Alan.
10:23:43 **Q** So each time that Mr. Alan came to see you and wanted --

the three times that he wanted the money sent from California to Houston, you sent him to see Mr. Truong and then you gave him the money from money you had in the Houston office?

**A** Correct.

10:24:16 **Q** Of course, you didn't report that to -- you didn't report that money that you were taking out of the Houston office to Mr. Sinh, did you?

**A** No.

**Q** Now, one of the things you were supposed to do as the 10:24:43 manager of the Houston office was to keep Mr. Sinh advised as to the business you were doing here; am I right?

**A** I reported to my Uncle Dong, D-o-n-g.

**Q** Are you telling this jury that you did not send reports to Mr. Sinh, "yes" or "no"?

10:25:26 **A** I didn't report but send to my Uncle Dong.

**Q** Did you send to Mr. Sinh?

**A** Which report you talking?

**Q** The report of the business done by US Tours?

**A** Yes, I did.

10:25:56 **Q** That's what you sent to Mr. Sinh?

**A** That? What means that?

**Q** What means that? What means that?

**A** I don't understand what "that" mean.

**Q** Okay. Every month you had to send a report of the 10:26:17 company's business to Mr. Sinh, didn't you?

10:26:53
10:27:19
10:27:50
10:28:09
10:28:31

**A** Correct.
**Q** And when was it that you first started keeping two sets of books while you were working for US Tours?
**A** In the office we have many books.
**Q** I apologize to you. You kept a set of black books at home, did you not?
**A** Those are for my business.
**Q** Did you keep them at home?
**A** Yes, I did.
**Q** And did you also have a set of books at the office?
**A** The one from home and the one in the office are the same.
**Q** Have you had a chance to look at the black books they took from your home when they searched your home?
**A** No.
**Q** Do you know what would you put in the black books?
**A** No.
**Q** You know that what you put in the black books is different than the forms you sent to Mr. Sinh showing --

MR. VARNADO: Judge, this states matters not in evidence at this time and there are -- there are black books right here if he wants to address the witness with which books they are.

MR. HAYNES: Yes, we will. That's not a proper objection. He's interrupting.

(Discussion off the record between Mr. Haynes and

Ms. Phan.)

BY MR. HAYNES:

**Q** Let me show you here what's marked --

MR. HAYNES: If I might approach the witness, Your Honor?

THE COURT: You may.

BY MR. HAYNES:

**Q** These are black books from your home?

**A** It's not from my home.

**Q** These black books never were in your home? They're marked Daily-J-u-l, Hien, Trang, Mai, Thai, Thao. You didn't have these black books in your home?

**A** No.

**Q** Take a look at the inside.

Oh, are these your records? Here, look at the front.

**A** Correct.

**Q** Are these records that you kept at your office or at home?

**A** The office.

**Q** Well, did you keep these black books -- there are three of them here in this box. Did you keep these three black books at home at any time?

**A** No.

**Q** Were these black books in your home when they came and searched your home after you were arrested?

10:30:22
10:30:50
10:31:13
10:31:37
10:31:58

**A** No.
**Q** This is -- you say these black books were kept at the office?
**A** Correct.
**Q** Is there another set of black books that you kept at the office?
**A** Many.
**Q** Same size or different?
**A** Same.
**Q** Did -- have you looked at any of these disks -- has the prosecutor shown you any of these disks?
**A** No.
**Q** Okay. And you've had some conversations, thought, with the prosecutor and Mr. Chiue, have you not?
**A** Yes.
**Q** When was the most recent time?
**A** Over a month ago.
**Q** How long a meeting was it?
**A** Over an hour.
**Q** And who was there?
**A** John.
**Q** You're talking about Mr. John Chiue, our special agent?
**A** John Chiue, yes.
**Q** And who else?
**A** The gentleman with the hand.

MR. MAGLIOLO: The older gentleman.

THE WITNESS: And the other gentleman behind you.

MR. VARNADO: The younger one, also.

BY MR. HAYNES:

10:32:18 **Q** This was not the first time you visited with them, though, was it?

**A** Correct.

**Q** When was the time before that that you visited with them?

**A** Over two months ago.

10:32:39 **Q** All right. And how long a meeting was that?

**A** Over an hour.

**Q** Same people there?

**A** Correct.

**Q** Did you have any other meetings with them other than those

10:32:57 two you've just told us about?

**A** Yes.

**Q** How many more -- when was the time before the second?

**A** Four months ago.

**Q** And how long a period of time was that meeting?

10:33:21 **A** Over an hour.

**Q** Same people there?

**A** Correct.

**Q** Any meetings other than that four months ago with these prosecutors and this special agent?

10:33:36 THE INTERPRETER: Could you repeat?

BY MR. HAYNES:
**Q** And this special agent, Mr. John Chiue?
**A** Yes.
**Q** You had other meetings?
10:33:45 **A** No.
**Q** No?
**A** No.
**Q** Did they meet with you in their office or did they come over to the detention center to meet with you?
10:34:09 **A** One time over here. Two time where I was locked up at.
**Q** Did they play any of the tapes for you on any of the three meetings you had with them?
**A** Yes, I did listen some tape.
**Q** Do you remember which tapes you listened to?
10:34:49 **A** No.
**Q** Were you asked to identify voices on tapes?
**A** Yes.
**Q** Could you identify all the voices on the tapes that they played for you?
10:35:04 **A** Yes.
**Q** Do you know if they ever talked to the lady you lived with who you sometimes called your wife?
**A** No.
**Q** Was she -- was she home during the day when they came to
10:35:29 your home and took evidence out of your home after you were

arrested?
**A** No.
**Q** She was at work?
**A** No.
10:35:45 **Q** Where was she?
**A** She was in California.
**Q** With the children?
**A** No.
**Q** Who took care of the children while she was gone to California?
10:36:00
**A** Me.
**Q** Well, you weren't home the day they searched your office, were you -- I mean, your -- searched your home, I apologize?
**A** I was at home.
10:36:23 **Q** Did you take the children with you to the office when you went to the office?
**A** At that time I was preparing to get -- to go to work.
**Q** At that time you were preparing to go to work. But when you went to work, did you take the children with you?
10:36:50 **A** I took them to babysitter.
**Q** And did Dong Phan go to work with you in the same car?
**A** The time that I was arrested -- Dong already was not working at least a month before I was arrested.
**Q** When he was working, did he go to work with you when he was living with you and your lady that you called your wife?
10:37:28

**A** He drove separately.
**Q** Yes, ma'am. When Alan came to see you, he told you that the money he wanted moved -- initially, that the money was from gambling, did he not?
10:38:10 **A** No.
**Q** Well, when he first came to see you and told you that he wanted you to move money for him, did he tell you where the money came from?
**A** No.
10:38:37 **Q** The second time he came to see you and wanted thousands of dollars moved for him, did he tell you where that money came from?
**A** He told me that is from his business.
**Q** And the third time he came to see you and wanted him -- 10:39:02 wanted you to move money for him, did he tell you where that money came from?
**A** No.
**Q** So of the three times you moved money for him, you thought all that money came from his business, is that what you're 10:39:21 telling our jury?
**A** Correct.
**Q** Did you ever listen to a tape recording between you and Alan where he was telling you where the money came from?
**A** Not yet.
10:39:53 **Q** Have they told you about the tapes, the prosecution?

10:40:25 10:41:00 10:41:24 10:41:50 10:42:11

**A** No.
**Q** In your mind, in your honest opinion, is there a tape where Alan Golbert is telling you the source of the money he wants you to move?
**A** No.
**Q** You never had that discussion with him ever?
**A** No.
**Q** All right. Now, after the time that you met Alan and got Truong to assist you in California -- Truong in California, you also had some other business relationships with Golbert, did you not?
**A** No.
**Q** Didn't you -- didn't he obtain for you some sort of computer?
**A** Yes.
**Q** Well, that was doing business with him, wasn't it?
**A** It's not a business.
**Q** Well, didn't he tell you he was going to get you some electrical equipment or electronic equipment?
**A** Yes.
**Q** And you were going to pay less than the price the store sold it for?
**A** Correct.
**Q** So what all did you get as a consequence of meeting with Mr. Alan Golbert?

10:42:33

**A** Laptop.
**Q** Anything else?
**A** (In English.) A satellite receiver.
THE INTERPRETER: Satellite receiver.
BY MR. HAYNES:
**Q** And did you pay Mr. Alan Golbert for the laptop?
**A** I did.
**Q** And did he tell you that the laptop had been obtained with a fraudulent credit card?
10:43:14
**A** No.
**Q** Did you think he was selling you property that he acquired illegally?
**A** No.
**Q** Is it your testimony to the jury that you thought
10:43:33
everything you got from him was acquired by him in a legitimate fashion?
**A** Correct.
MS. PHAN: Can I have a moment to confer?
THE COURT: You may.
10:44:12
(Discussion off the record between Mr. Haynes and Ms. Phan.)
BY MR. HAYNES:
**Q** During that period of time, Mr. Huynh, did you know anybody who was buying or selling marijuana?
10:44:49
THE INTERPRETER: Could you repeat that, please?

MR. HAYNES: Sure.

BY MR. HAYNES:

**Q** During that period of time when you were talking to Alan Golbert, did you know anybody who was buying or selling marijuana?

10:45:00

**A** No.

**Q** Did there come a time when you were working for US Tours when you came to know somebody who claimed to be buying or selling marijuana?

10:45:21

**A** No.

**Q** Did you ever ask anyone if they knew where you could obtain marijuana?

**A** No.

**Q** All right. When -- had you been putting the US Tours records on your laptop from the beginning of the time that you went to work for US Tours here in Houston?

10:46:04

**A** No.

**Q** I'm talking about your personal laptop.

**A** No.

10:46:30

**Q** Actually, there was the laptop that you used in the office for office business, was there not?

**A** Correct.

**Q** And then, you had a private laptop that you used, was your personal laptop, correct?

10:46:53

**A** Right.

**Q** And you used the company -- or the office laptop to send the records to Mr. Sinh in California concerning US Tours' business, correct?
**A** The office doesn't use the laptop.
10:47:25 **Q** You don't use the laptop in the office?
**A** That's mine. I left it in the office.
**Q** Did the office have a laptop when you went to work for them?
**A** No.
10:47:45 **Q** Did the office have a computer or a laptop after -- or desktop after the time you started to work for them?
**A** Yes. They have two computers.
**Q** Desktop?
**A** Right.
10:48:14 **Q** And it's the desktop computer that you used to send the financial information to Mr. Sinh in California?
**A** Correct.
**Q** Now, the -- when you were arrested, the arresting agents took the laptop computer from your home?
10:48:54 **A** From the office.
**Q** So you had it at the office at the time you were arrested?
**A** Correct.
**Q** But the agents also took the desktop computer from the office, did they not?
10:49:09 THE INTERPRETER: Could you repeat that?

MR. HAYNES: Sure.

BY MR. HAYNES:

**Q** The agents who searched your home and searched the office also took the laptop -- or desktop computer from the office, did they not?

**A** No.

**Q** Did not?

Did you ever find out what information was on the desktop computer there in the office that was used for company business?

**A** Correct.

**Q** You were shown some exhibits yesterday that looked like money records. Do you remember looking at those yesterday?

**A** Yes.

MS. PHAN: Your Honor, may I approach to give him the exhibits?

THE COURT: You may.

MS. PHAN: This is Government's Exhibit 13A.

BY MR. HAYNES:

**Q** You have just been handed Government's Exhibit 13?

MR. VARNADO: I believe it's just the first two pages of that exhibit, just so the record is clear.

MS. PHAN: Yeah.

THE WITNESS: Correct.

//

BY MR. HAYNES:

**Q** Now, are those -- those are documents that you said that you used to record the business of US Tours; am I right?

**A** At that time I haven't been working at the office.

10:51:07 **Q** I apologize to you. When you're saying at that time you haven't been working at the office, what time are you talking about?

**A** This show January, 2003.

**Q** And at that time you were not at the office?

10:51:33 **A** Not yet.

**Q** All right. Can you find one that shows when it was that you were at the office?

MS. PHAN: Your Honor, do I have permission to hand him the exhibit?

10:51:50 THE COURT: Yes.

MS. PHAN: There's a lot of them. Should I hand him the whole stack?

THE COURT: I think maybe you can get some help from the Government there.

10:52:11 BY MR. HAYNES:

**Q** Well, Mr. Huynh --

THE COURT: Wait, wait. Let her hand it to him.

What's the number?

MS. PHAN: It's 13 but it's all the exhibits of 13.

10:52:25 MR. VARNADO: 13A.

THE COURT: 13A, all right.

BY MR. HAYNES:

**Q** Do you recognize those, Mr. Huynh?

**A** Yes.

10:52:41 **Q** Are those -- do you call those spreadsheets?

**A** Correct.

**Q** Did you go to some supply store and buy these spreadsheets, the forms?

**A** No.

10:53:12 **Q** Were these spreadsheet forms there in the office when you first started working for US Tours?

**A** Correct.

**Q** So you never had to get any spreadsheets from anyplace, is that what you're saying?

10:53:38 **A** No, I did not.

MS. PHAN: Can I have a moment, Your Honor?

BY MR. HAYNES:

**Q** Did you generate these spreadsheets that are before you on your computer, "yes" or "no"?

10:54:09 **A** I don't quite understand the question.

**Q** What part of the question didn't you understand, the word "generate"?

THE COURT: I think, perhaps, that the confusion is which computer because he's talked about three computers at the office.

10:54:33

MR. HAYNES: I think you're right, Your Honor, and I apologize.

BY MR. HAYNES:

**Q** I'm talking about the computer that you used to put data in on the sheets that are there before you.

10:54:41

THE COURT: Just -- can you ask the question? Just ask it again.

BY MR. HAYNES:

**Q** What computer did you use to put the data on the sheets that are there before you?

10:54:53

**A** Office computer.

**Q** Now, what was the make of the office computer?

**A** I don't remember.

**Q** How was it different from your laptop computer?

10:55:32

**A** My laptop is small. Computer office is big.

**Q** And you used the computer office -- the office computer to send the financial information to Mr. Sinh about the business that you were doing in US Tours in Houston?

**A** Yes. I use the office computer to report to my Uncle Dong and Uncle Sinh.

10:56:13

**Q** Can you show me a document that indicates on it that you sent it to Uncle Dong?

**A** All this report was sent to my Uncle Dong.

**Q** All right. So you sent a copy to Mr. Sinh?

10:56:54

**A** If you told me this one, never been sent to Uncle Sinh.

**Q** What did you send to Uncle Sinh every month then to let him know what the business was of US Tours?
**A** At the office we have a separate sheet to report to Uncle Sinh.
10:57:27 **Q** Are any of those sheets that you used to report to Uncle Sinh there before you, Government's Exhibit 13?
**A** It's not here.
MR. HAYNES: If I might approach the witness, Your Honor?
10:57:49 THE COURT: You may.
BY MR. HAYNES:
**Q** So all of these exhibits that you looked at yesterday for the prosecutor are exhibits that never got sent to Mr. Sinh, is that what you're telling us?
10:58:08 **A** No.
**Q** All of these exhibits then that you looked at yesterday were sent, according to you, to Dong, Uncle Dong. How did you send them to him, sir, if I might ask?
**A** E-mail.
10:58:35 **Q** Every month you e-mailed a document such as this one right here which is the spreadsheet? You e-mailed it to Uncle Dong every month?
**A** Correct.
**Q** Then every month you sent Mr. Sinh a different statement concerning the company business?
10:59:01

**A** Correct.
**Q** Has anybody shown you the statements that you say you sent to Mr. Sinh?
**A** I don't see it here.
10:59:29 **Q** Have you since the time that you've been arrested, while you were having conferences with counsel for the prosecution and the special agent, have you seen any of the copies of the business reports that you sent to Mr. Sinh every month?
**A** No.
11:00:02 **Q** All right. So every month you sent -- every month you sent how many pages of the spreadsheets to Mr. -- to Uncle Dong by way of e-mail?
**A** An Excel file has many page like this.
**Q** All right. Think back to a month where you said you sent 11:00:29 them by e-mail to him every month. How many pages every month did you send Uncle Dong that were different from those spreadsheets that you have there in front of you?

MR. VARNADO: Just object to the question as vague and compound.

11:00:55 THE COURT: Yeah. It's confusing. You might want to rephrase it.

MR. HAYNES: I will, Judge.

BY MR. HAYNES:
**Q** Mr. Duc Huynh, you sent every month to Mr. Sinh a 11:01:11 spreadsheet that showed the company business for the month?

Isn't that what you told our jury?

**A** This I sent to Uncle Dong.

**Q** I apologize to you. My question probably wasn't clear. Every month you sent a different sheet of paper to Mr. Sinh showing the company's business for that month. Isn't that what you told our jury?

**A** Correct.

**Q** All right. Now, did you keep a copy of what you sent to Mr. Sinh there in your office of US Tours here in Houston?

**A** Yes.

**Q** How were -- how was it different, the information you sent to Mr. Sinh, from the information that you sent to Uncle Dong?

**A** The different is the document report to Uncle Sinh show only the bank deposit each month from Houston office.

**Q** You didn't send Mr. Sinh an information sheet showing the business that the Houston US Tours office did for the month, the amount of money they took in, the amount of money they sent out, and the amount of money they made?

THE INTERPRETER: Let me clarify. I didn't understand what he said.

THE WITNESS: (Through interpreter.) I didn't declare report the big amount of money the people give to us.

BY MR. HAYNES:

**Q** Is there anything in writing that you have that you can show us anywhere that indicates or tells you to report to

Mr. Sinh but not tell him about the big amounts of money that were brought in to US Tours?

**A** We have report to send to Uncle Sinh only.

**Q** And the report to Uncle Sinh only, was it an accurate report showing accurately how much money had come in to US Tours and how much money had been sent out?

**A** Yes.

**Q** And the object of the exercise, the purpose of it, was so that Mr. Sinh could keep the US Tours business books; isn't that true?

**A** Because I did two reports. So when you ask me like that, I don't know which one.

**Q** Well, you only sent one report to Mr. Sinh and it was the legitimate business of US Tours, wasn't it?

**A** Correct.

**Q** And then, you say you sent by e-mail another spreadsheet to Uncle Dong every month which included all the business, whether you thought it was legitimate or not?

**A** No.

**Q** No?

**A** I think this report are not very legitimate.

**Q** Well, that's the report you say you sent to Uncle Dong, isn't it?

**A** Correct.

**Q** And when you say they're not very legitimate, you put all

the data on it, did you not?
**A** Yes. I was putting all the detail on this present spreadsheet. Well, I said that it's not correct which mean that I'm not sure because the amount is big. So I'm not sure it's correct or not. Because all this report truthful and they're correct.
**Q** Nobody else put any data on any of those reports except you?
**A** Correct.
**Q** And nobody else put any data on any report that you sent to Mr. Sinh except you?
**A** Correct.
**Q** And the difference between the reports that you sent to Mr. Sinh and the one you sent -- the ones you sent to Uncle Dong, the man on trial here, is that the ones that you sent to Mr. Sinh didn't have all the big numbers in it?
**A** Correct.
**Q** And you say that they didn't have all the big numbers in it because Uncle Dong told you not to put them on the report you sent to Mr. Sinh?
**A** Right.
**Q** Now, there is nothing -- you've seen nothing by way of a telephone conversation that was recorded or an e-mail between -- or a letter or a postcard between you and Uncle Dong where he tells you anything at all about how to prepare the documents, do

11:09:45 you, sir -- is there?
**A** No.
**Q** And there's no -- and when you went to work, did -- you got instructions, did you not, on how to handle money that was being transmitted?
**A** Correct.
**Q** And you knew that there were certain sums of money, that if the amount was over $10,000, you had to get the Social Security number and the name and the address of the person who was making the remission, right?
**A** Correct.
**Q** And if those -- if the amount was over $3,000, you had to get some additional information -- you had to get other information from them to turn it in to the State of Texas; am I right?
**A** I did take some information, but I didn't fill out the form.
**Q** You knew that you had to fill out a form, though, didn't you?
**A** I knew but my Uncle Dong told me that the office in California will do that part.
**Q** And did your Uncle Dong tell you how the office in California was going to get the information that you should have got in Houston?
**A** I report information to the California office.

**Q** Who did you report it to?
**A** To Uncle Sinh.
**Q** You told Uncle Sinh the name of everybody that brought money into US Tours while you were on duty?
11:12:15 **A** Well, there's two kind of clients. We have one kind --
**Q** Two kinds of clients?
**A** One kind is minimum, small amount of money that we report; and big amount of money we don't report.
**Q** Did you ever in writing advise Uncle Sinh, Mr. Sinh,
11:12:39 Colonel Sinh, that you were not reporting all of the money that was being taken in to US Tours for remission? Did you ever?
**A** My Uncle Dong told me that --
**Q** I didn't ask you what your Uncle Dong told you. I asked you if you ever told Mr. Sinh. Just "yes" or "no," please.
11:13:11 **A** What things talk to Uncle Sinh?
**Q** That you were going to send reports out there that wouldn't accurately reflect the amount of money being taken in by US Tours?
**A** All the report reflects all the numbers on the books. So I
11:13:55 don't think that report is not correct.
**Q** So every report you sent to Mr. Sinh was correct in terms of the amount of money that came in?
**A** Well, I told you there's two kind of amount: the small amount and the big amount. The report to Mr. Sinh is the small
11:14:34 amount, and the other one Uncle Sinh wouldn't know.

**Q** So my question to you is the report that you sent to Mr. Sinh every month, does it accurately reflect the amount of money that came into US Tours, "yes" or "no"?
**A** No.
11:15:08 **Q** And every month you e-mailed a report to Uncle Dong that showed the accurate amount of money that came in, including the large amounts?
**A** Correct.
**Q** And you're positive that every month you did it by e-mail?
11:15:40 THE INTERPRETER: Excuse me, sir.
BY MR. HAYNES:
**Q** You're positive that every month you reported to Uncle Dong the large amounts, all the money that came in, by e-mail?
**A** Correct.
11:15:58 **Q** Do you see there before you a copy of any report that accurately reflects only the small numbers -- amount of money that came in that you sent to Mr. Sinh every month? Have you seen those reports?
MR. VARNADO: Objection. Asked and answered.
11:16:16 THE COURT: Sustained.
BY MR. HAYNES:
**Q** Did you send them to Mr. Sinh by e-mail or by computer?
**A** E-mail.
MS. PHAN: Moment to confer?
11:16:42 THE COURT: You may.

(Discussion off the record between Mr. Haynes and Ms. Phan.)

BY MR. HAYNES:

**Q** Mr. Huynh, at US Tours office here in Houston when you were running the place, there was the US Tours server there, was there not?

11:17:08

**A** No.

**Q** On the computer you had there in the office at US Tours, can you access the server?

11:17:46

**A** Yes, I could.

**Q** As a person literate in computerology (phonetic spelling), you know how to use the server, do you not?

**A** My Uncle Dong taught me how to use the server.

**Q** Your Uncle Dong taught you how to use the server?

11:18:21

**A** Correct.

**Q** Well, your Uncle Dong didn't tell you how to marry a woman who was an American citizen?

MR. VARNADO: Objection.

THE COURT: Sustained, sustained.

11:18:39

MR. HAYNES: What's the objection?

MR. VARNADO: Argumentative.

MS. PHAN: Moment, Your Honor, to confer.

(Discussion off the record between Mr. Haynes and Ms. Phan.)

11:19:24

//

BY MR. HAYNES:
**Q** Mr. Huynh, I take it since your Uncle Dong taught you how to use the server that when you came to Houston as the US Tours manager, you familiarized yourself with the location of the server, did you not?
11:19:37
**A** Well, because he gave me -- I can access through the computer server because he gave me the password, user.
**Q** So you became familiar with it as soon as you came to Houston to become the US-Tours-in-Houston manager; is that correct?
11:20:38
**A** When I start working, we didn't have a server yet. It came in later.
**Q** The server came in after you started working in Houston?
**A** Correct.
11:20:55
**Q** And at the time was Dong Phan working for you?
**A** Yes, he did.
**Q** Did Dong Phan have the password to the server?
**A** No.
**Q** Can you tell us why you never advised Mr. Sinh that Dong Phan was an employee
11:21:20
MR. VARNADO: Objection. Relevance.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** Well, did you ever get the Social Security number of Dong Phan and provide it to Mr. Sinh?
11:21:39

MR. VARNADO: Same objection.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** Did you ever ask Mr. Sinh about Dong Phan being an employee?
11:21:52
MR. VARNADO: Objection. Relevance.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** Did you give the password to the server to Mr. Dong Phan?
11:22:13
MR. VARNADO: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** Did anybody else in your office there in Houston have the password to the server?
11:22:21
**A** No.
**Q** Just you and who?
**A** Only me.
**Q** And what was the password?
**A** I don't recall.
11:22:37
**Q** Did you use it very frequently?
**A** No.
**Q** Well, wasn't the data on the server data from all of the other US Tours offices?
**A** I don't know.
11:23:05
**Q** Did you -- were you able to look to see what information

was available from other US Tours offices on your server?
**A** No.
**Q** What did you use the server for there in your office here in Houston when you were the manager?
11:23:35 **A** Only to extract new information from the company.
**Q** Well, you used it only to extract new information for the company?
**A** When the company told me that I need to extract those new information to relay it to my employee, then I'll do.
11:24:13 **Q** And what sort of information did you extract from it to relay to your employees?
**A** Now, I don't recall.
**Q** Well, you only had three employees counting your wife or the lady you were living with, right?
11:24:52 **A** Correct.
**Q** Now, did you ever have a face-to-face conversation with Mr. Sinh concerning the information you were sending him over the server?
**A** No.
11:25:18 **Q** Did you ever tell Mr. Sinh that the records you were sending him did not accurately reflect the total of the money that was being taken in by the US Tours office in Houston?
**A** No.
**Q** Did you ever in writing request of anybody that your salary
11:25:49 be increased from the money that you told us that you were being

paid when you were asked about it on direct examination?

THE INTERPRETER: Could you rephrase that?

MR. HAYNES: Sure.

BY MR. HAYNES:

11:26:05 **Q** You told us on direct examination that you were being paid $2500 a month and working from 7:00 in the morning to 7:00 at night seven days a week?

**A** Correct.

**Q** And did you ever put anything in writing to anybody requesting a raise? 11:26:32

**A** No.

**Q** Did you think that the money you were making on the side would be compensation for you for the long hours you were required to meet?

11:27:11 **A** I don't think so.

**Q** Did you ever tell anybody in management that you had made money on the side doing business with Alan Golbert?

**A** No.

**Q** Did you report the money you made doing business with him on the side on your income tax for the year? 11:27:43

**A** No.

MR. VARNADO: Your Honor, I'm going to object to the document they're going to attempt to enter into evidence at this time. It's a tax return. It has no bearing on this proceeding, and the Defendant has just answered that he didn't claim that 11:28:36

money on the tax return. It simply would delay this proceeding even more. I would object to the document.

MR. HAYNES: It was provided for us by the Government during the --

11:28:46 THE COURT: Well, let's just approach the bench, please. Approach the bench.

(At side bar.)

THE COURT: What is the relevance?

MR. HAYNES: Well, on direct they asked him how much he made. It sounds like he had to steal on the side because he wasn't getting paid.

THE COURT: You didn't ask him how much he got paid. He had already told us several times how much he got paid.

MR. HAYNES: I know.

11:29:30 THE COURT: What difference does it make?

MR. HAYNES: If he lied to us, then we need to know to take a look, to look at the money he's showing he made.

THE COURT: So what?

MR. HAYNES: That means he lied to us.

11:29:43 THE COURT: How does that mean he lied to you? He got paid $2500 a month from this operation. We don't know what else he got paid from other people.

MR. HAYNES: I asked him that and he didn't give --

THE COURT: No, you didn't ask him that.

11:29:55 MR. VARNADO: You didn't ask him that.

THE COURT: You did not ask him that.

MR. HAYNES: Well, if that's a credible question, I'll ask him.

MR. VARNADO: Frankly, all this stuff would already be asked and answered if it's getting on to did he claim money on his tax returns and various other things and who did he file tax returns with. We sat through and did not object to a lot of questions that had very questionable relevance to this proceeding. This is just simply going to delay this proceeding even further.

11:30:13

THE COURT: I mean, what --

MR. HAYNES: Are you kidding?

MR. VARNADO: I haven't even seen them, to be honest with you. I just know what it is, the tax returns. I don't even know what numbers are on it. I'm just objecting on the principal of trying to introduce it into evidence, particularly since this matter has been covered. Income year 2003, all that, who he filed taxes with. These questions are asked and answered.

11:30:16

MR. HAYNES: They are not. He has not told the story truthfully.

11:30:35

THE COURT: I'm sorry?

MR. HAYNES: He has not told the story truthfully, Judge.

THE COURT: Well, you haven't -- look, it's

11:30:43

irrelevant, okay? It's irrelevant.

MR. HAYNES: Whether he tells the truth or not?

THE COURT: No, that's not what I'm saying. I'm saying all this about taxes is just irrelevant.

11:30:56 MR. HAYNES: If it shows his income and that he didn't tell the straight story to the jury, it goes right to his credibility.

THE COURT: No. It's irrelevant what he made from other sources. It's irrelevant.

11:31:06 MR. HAYNES: Well, the prosecution put up what he was paid.

THE COURT: She's also on the income tax return so --

MR. HAYNES: She doesn't know it, though.

THE COURT: Yes, she does. He said she did.

11:31:18 MR. HAYNES: I don't believe that's what he said. Do you, Judge?

THE COURT: Well, you know, I don't know. All I'm saying is what this number reflects is both of their incomes. We don't even know what she does.

11:31:27 MR. HAYNES: We can find out.

THE COURT: Well, we don't need to because it's irrelevant. It's irrelevant.

MR. HAYNES: The Court's ruling is going to deny me the right to ask this witness about the income tax that I intend to file? It's a tax return for 2003 and he filed it with

11:32:04 Vivian K. Mai and Duc D. as a joint return, showing his address as 2242 Sleepy Hollow Avenue in Hayward, California; and if the Court won't let me get into it, then I object to it; but I will file it for the record to show what it is we'd like to talk about.

THE COURT: All right. We'll do that later.

MS. PHAN: What exhibit number would we file it?

THE COURT: That would be --

MR. HAYNES: 16, 17?

11:32:14 THE COURT: That would be 17.

MS. PHAN: 17, okay.

THE COURT: We'll just mark it for identification later. Move on to the next question.

(Side bar concluded.)

11:32:55 MS. PHAN: Should I go ahead and take a sticker?

THE COURT: Yes.

But just move on to the next question, please.

MS. PHAN: The annual tax return --

THE COURT: No, no. Put the sticker on. Mr. Haynes asks the next question, all right?

11:33:05

MS. PHAN: Okay.

BY MR. HAYNES:

**Q** One of the questions that was asked of you by the prosecution, Mr. Huynh, was how much money the travel part of US Tours and US Tours and Remitters made. And so to get to that,

11:33:33

US Tours bought airplane tickets by the gross from various airlines, did they not?
**A** A lot of tickets we issue at the office. We got permission from the airline company directly.
11:34:28 **Q** Well, you bought the tickets at a price less than what you sold them to the customers for; isn't that true?
**A** You mean -- I don't understand. Please clarify. I bought the ticket from where and from whom?
**Q** Didn't you have to buy the tickets from the airline 11:35:00 companies?
**A** That Uncle Dong would know. I don't know.
**Q** When you were the manager of US Tours in Houston, you had airline tickets to sell to customers, did you not?
**A** Correct.
11:35:24 **Q** And the price you sold them for to the customer was more than what you had to pay for them; isn't that true?
**A** Of course.
**Q** All right. So there wasn't any need to alter the numbers concerning the airline tickets in order to deceive anybody, was 11:35:50 there?
**A** I don't understand the question.
**Q** Well, you told us that you altered the numbers on the spreadsheet in order to not show Mr. Sinh the large amount of money that was coming in to US Tours. Isn't that what I heard 11:36:17 you say to this jury?

11:37:19 11:37:54 11:38:14 11:38:17 11:38:28

**A** I don't understand the question.
**Q** Yes. When -- the bottom line of it is, Mr. Huynh, you altered the numbers that you submitted to Mr. Sinh, did you not?
**A** I don't understand what you mean by "alter." I didn't change anything.
**Q** Alter -- alter means change or omit.
**A** I didn't alter anything myself.
**Q** You didn't show Mr. Sinh a different number than what you gave -- what you showed to Uncle Dong?
**A** I told you many times in the office we have two type of record, two type of amount of money.
**Q** My question may not have been clear. I apologize.

MR. VARNADO: Your Honor, I just object. These questions have been asked and answered numerous times.

THE COURT: It has been.

Let's go on.

MR. HAYNES: I keep getting a different answer, Your Honor.

THE COURT: No, you don't get a different answer. It's been asked and answered several times. Now, please move to the next question.

MR. HAYNES: How can he not understand it, Judge. That's what --

MR. VARNADO: Object to the side bar.

MR. HAYNES: I apologize.

BY MR. HAYNES:
**Q** Well, what -- what are the things that you did, you did, that caused you to plead guilty and go to the federal penitentiary?
11:38:45 MR. VARNADO: Your Honor, this question has been asked and answered as well. I would object.
THE COURT: It has been. It was yesterday.
MR. HAYNES: I never heard him say --
THE COURT: Well, maybe you weren't listening. But I did.
11:39:02 MR. HAYNES: All right. I'll restate the question.
BY MR. HAYNES:
**Q** What are the things that you did that were against the federal law that you didn't get charged with and you didn't have to plead guilty with -- to and it still remains open?
11:39:11 **A** I didn't do anything.
**Q** Okay. When -- so that we don't have a misunderstanding about this, did you have any other source of income during the period of time when you were here as the manager of US Tours in Houston other than the money you made from US Tours in Houston, "yes" or "no"?
11:40:01 **A** No.
**Q** Did your -- did the lady that you were living with, the mother of your two children, have any other source of income other than the check she received as an employee of US Tours in
11:40:34

Houston?
**A** No.
**Q** Did you have occasion to -- are you responsible for putting up the signs in your office here in Houston that told the employees in English and in Vietnamese how to comply with the currency transaction law?
**A** No.
**Q** Was it on the walls of the Houston office, these postcards type things, that had the instructions on them?
11:42:07 **A** Those, I receive it from California from my Uncle Dong.
**Q** I apologize to you for not asking you where you received it from. Did you give -- when you got them, did you put them on the wall in the office here in Houston, "yes" or "no"?
**A** Yes.
11:42:29 **Q** All right. And were they there when the FBI raided the office and arrested you?
**A** I wasn't there when the raid happened.
**Q** Did you ever order anybody to take down the instructions on how to comply with the currency reporting law?
11:42:57 **A** No.
**Q** Were they there the last day that you were in US Tours?
**A** The day I was arrested, I wasn't at the office.
**Q** The last day you were in the office, were they there, sir?
**A** Yes, they were there.
11:43:34 **Q** Is that the day before you were arrested?

11:43:58
11:44:30
11:44:51
11:45:20
11:45:47

**A** Correct.
**Q** And did you after the time of -- you became a manager, did you go to some school to get lessons in how to comply with the currency transaction reports?
**A** No.
**Q** Did you ever hear of any of the people who worked for US Tours who went to a school to learn how to comply with the currency transaction reports?
**A** No.
**Q** Did you ever go to the US Tours office in Arlington?
**A** What courses?
**Q** I beg your pardon?
**A** What courses, what classes?
**Q** I apologize to you. Without regard to classes, did you ever go to the US Tours office in Arlington, Texas?
**A** Yes.
**Q** How many times, please?
**A** I don't remember exactly. One or two times.
**Q** Did you know a lady by the name of Mong Cole?
**A** Yes.
**Q** And did you meet her when you went to Arlington?
**A** Yes.
**Q** Now, did you introduce yourself to her?
**A** Yes.
**Q** And had you talked to her on the phone before the time you

went to Arlington and first met her?
A Yes.
Q And did you ever have conversations with Mong Cole over the phone about moving money from the United States to Canada?
11:46:12 A No.
Q Did you ever assist Mong Cole or anybody in her office to try to move money from Arlington to any other place?
A Mong Cole did assist me to send money from Arlington to Houston.
11:46:53 Q Mong Cole assisted you or asked you?
A I ask her assistance.
Q You called Mong Cole?
A Yes.
Q And you asked Mong Cole to help you?
11:47:16 A Yes, correct.
Q And when was this, please?
A I don't recall.
Q What year?
A I think 2003.
11:47:29 Q After the time you had become a manager at US Tours in Houston?
A Correct.
Q And had you talked to Mong Cole before the time you called her to ask her to help you move money from up there to here?
11:47:46 A Yes, I did talk to her, explain working in the same

11:48:18
company.
**Q** Well, did she talk to you on a regular basis?
**A** No.
**Q** Did you call her from time to time?
**A** Only when something to ask.
**Q** Only when some things what?
**A** For instance, like Uncle Dong asked me to observe the Arlington office; and then, a lot of thing I have to call Mong Cole to ask information.
11:48:55
**Q** All right. One more time: Uncle Dong told you that you needed to go to Arlington to look at the -- Mong Cole's office?
**A** He asked me to make a phone call.
**Q** And did he ask you to make the phone call by telephone?
**A** Yes.
11:49:34
**Q** And in 2003?
**A** Yes. During the time I work at Houston.
**Q** And did you, as a result of his phone call to you, call Mong Cole?
THE INTERPRETER: I'm sorry?
11:49:53
BY MR. HAYNES:
**Q** Did you, as a result of Dong's phone call to you, call Mong Cole?
**A** I don't understand the question. What is "result"?
**Q** Did you call Mong Cole?
11:50:11
**A** I did.

**Q** And did you talk to her?
**A** I did.
**Q** And did you talk to her about moving money from Arlington to anyplace else in the world?
11:50:28 **A** No.
**Q** Did you ever talk to Mong Cole about moving money or assisting her in moving money anyplace?
**A** I only one time ask her to assist me to send the money from Arlington to Houston.
11:50:54 **Q** When was that, please?
**A** During 2003. I couldn't remember the month.
**Q** And how much money were you going to ask her to move from Arlington to Houston?
**A** I don't recall. It's about over $10,000.
11:51:27 **Q** Is there anything in writing anywhere that we could look at that would -- that would reflect that request by you of Mong Cole to assist you in moving the money, over $10,000, to Houston?
**A** No.
11:51:57 **Q** Have you ever heard a telephone conversation that was wiretapped between you and Mong Cole where you talk about asking her to help you move over $10,000 from Arlington to Houston?
**A** No.
**Q** Is there some record that you can direct me to now that we
11:52:30 could show the jury that would reflect this effort by you to get

Mong Cole to help you move the 10,000 -- over $10,000 from Arlington to Houston?

MR. VARNADO: Objection. This question has been asked and answered and it assumes facts not in evidence.

11:52:48 THE COURT: Sustained.

MR. HAYNES: What's not in evidence?

(Discussion off the record between Mr. Varnado and Mr. Haynes.)

BY MR. HAYNES:

11:53:06 **Q** Did Mong Cole agree to assist you to move the $10,000 from Arlington to Houston?

**A** I would like to add part of that money came from Alan Golbert.

**Q** All right. Now, let me ask you this: Why do you want to ask that before you answer that question, sir? 11:53:31

**A** Because you ask too many questions.

**Q** True. Part of that money that you want -- that you wanted Mong Cole to help you move came from Alan Golbert?

**A** Yes. One time it's over $10,000.

11:54:06 **Q** And did you tell her that the money came from Alan Golbert?

**A** Yes, I told her it's from my friend.

**Q** At that time did you consider Alan Golbert your friend?

**A** Correct.

**Q** Did you think at the time that the money that Alan Golbert was trying to move around was legitimate money? 11:54:30

MR. VARNADO: Objection. Asked and answered.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** I'm talking about the money to Mong Cole, that money. Did you think that money was legitimate?
**A** Correct.
**Q** Did you ever ask Alan Golbert where he got the money?
**A** No.
**Q** Did he ever tell you where the money came from?
**A** He told me it's from his business.
**Q** Well, did Mong Cole say that she would assist you in moving this money that came from Alan Golbert?
**A** Correct.
**Q** And you said some of the money came from Alan Golbert. Was some of the money from some other person?
**A** Nowhere. I only help Alan Golbert to send the money and that was it. There's no -- no more amount of money.
**Q** Oh, I apologize. I thought you said that some of the money that you were talking to Mong Cole about came from Alan Golbert and that's why you didn't want to answer that question?
MR. VARNADO: Objection. Argumentative, misstates the witness's answer, and --
THE COURT: Sustained.
BY MR. HAYNES:
**Q** Did she help you try to move Alan Golbert's money?

MR. VARNADO: That has definitely been asked and answered, Your Honor. Objection.

THE COURT: Sustained.

BY MR. HAYNES:

11:56:38 **Q** What happened next? After you made that phone call, what did she do?

**A** I told her that there will be --

**Q** I'm sorry, what happened next? I don't want to know what you told her. What happened next after you asked her to help you move the money?

11:57:02

**A** She accept the money for me.

**Q** Took the money from whom?

**A** From Alan Golbert.

**Q** Did you send Alan Golbert up there to Arlington to see her?

11:57:24 **A** No.

**Q** Did you tell Alan Golbert how to get to Arlington to see Mong Cole?

**A** No.

**Q** How did Alan Golbert know to go to Arlington to see Mong Cole?

11:57:50

**A** I thought he did by himself.

**Q** You thought he did by himself?

**A** Yes, right.

**Q** And did he give the money to Mong Cole?

11:58:07 **A** Yes.

Q And did Mong Cole try to get the money delivered to Houston?
A No.
Q What did Mong Cole do with the money, if you know, of your own personal knowledge?
11:58:21
A She deposit it in a bank.
Q And did it get sent out of the bank anyplace for Alan Golbert?
THE INTERPRETER: Excuse me?
11:58:42
BY MR. HAYNES:
Q Did it get sent from the bank to anyplace for Alan Golbert?
A No. I only get the money, give to Alan Golbert from Houston. That's it.
Q Oh, you got the money and you gave it to Alan Golbert, is that what you're telling this jury?
11:59:07
A Correct.
Q And you got the money from whom?
A From the clients of my office.
Q From the clients of your office?
11:59:39
A From the big amount that I have in the office, I give it in advance to Alan.
Q Is there any record that you have looked at that will reflect that amount of money that you took from somebody else's account and gave to Alan Golbert?
12:00:08
A No.

12:00:27 12:00:50 12:01:10 12:01:43 12:01:59

**Q** And it was over $10,000?
**A** And then, I took the money from -- I withdraw the money from the bank and I put it back.
**Q** You withdrew the money from the bank that Mong Cole put it in?
**A** I didn't remember which bank, but that bank that I withdraw is for one of my bank.
**Q** Well, if she put it in your bank, it was still Alan Golbert's money, wasn't it?
**A** Correct.
**Q** Yes?
**A** Yes.
**Q** And so if she put it in the bank and you took it out, what did you do with it after you took it out of the bank?
**A** I took that money out and I put it back in the office money that I receive from my client.
**Q** Did Mr. Golbert ever get his money?
**A** Yes, he did.
**Q** From whom?
**A** From me.
**Q** I thought you put it back in the account in your office so -- under the accounts of your clients?
MR. VARNADO: Judge, we just object to this line of questioning as cumulative to the exact explanation he gave about the transfer from California to Texas.

THE COURT: Sustained.

MR. HAYNES: If the Court's ruling precludes me from asking questions about the source of -- where the money went --

THE COURT: Don't ask him any more questions. You're repeating yourself now. He's already explained what happened. Let's move on.

MR. HAYNES: I must be real dumb, Your Honor, because I can't figure out how he could put the money --

THE COURT: You know, this is not an argument, okay?

MR. HAYNES: I understand, Judge.

THE COURT: Now, let's just move on. Ask another question.

MR. HAYNES: The Court notes my objection.

BY MR. HAYNES:

**Q** Well, at some time while you were running the US Tours office in Houston, you had to take money to the bank here, did you not?

**A** Correct.

**Q** And you utilized an armored truck service from time to time from the bank to come to US Tours and pick up the money?

**A** Yes.

**Q** And they charge you a service for it?

**A** Yes.

**Q** But did you use the armored truck service every time you needed to carry money to the bank?

**A** The armored truck came daily, almost daily.
**Q** So did you use them every time that money needed to go to the bank from US Tours?
**A** The company use the armored car for deposit the money to the bank.
12:04:02
**Q** Okay. Every day?
**A** Yes, correct.
**Q** All right. Did there come a time when you had somebody working there for you at US Tours in Houston you called Uncle Bao?
12:04:16
**A** He work before I came in.
**Q** Well, was he there in Houston working at US Tours after you became -- after you came to Houston and began working for US Tours?
12:04:39
**A** No.
**Q** So any time Uncle Bao was there, you were not working at the Houston office of US Tours and Remittance? That's your sworn testimony to the jury?
**A** I'm not clear about the question.
12:05:07
**Q** Sure. You were there when Uncle Bao got robbed in the yard of US Tours, were you not?
**A** Yes.
**Q** So was Uncle Bao working for US Tours at the time he got robbed in the yard, in the property of US Tours?
12:05:38
**A** Yes.

12:06:03 12:06:23 12:06:43 12:07:00 12:07:42

**Q** Was he employed by US Tours at the time?
**A** That only my Uncle Dong would know. I don't know.
**Q** Weren't you the manager?
**A** I wasn't a manager at that time.
**Q** Who was the manager of US Tours at the time Uncle Bao got robbed?
**A** I think that Uncle Dong.
**Q** Well, Uncle Dong wasn't even in Houston at that time when Uncle Bao got robbed, was he?
**A** Correct.
**Q** He was not in Houston?
**A** Correct.
**Q** So who was the manager while Uncle Dong was not in Houston but was in California?
**A** You should ask Uncle Dong.
**Q** I'm asking you, sir.
**A** I don't know.
**Q** On the day that Uncle Dong got -- Uncle Bao got robbed, were you going to the bank that day with some funds or on some mission for the US Tours?
**A** I was at the airport.
**Q** Well, you were going to the airport from the office, were you not?
**A** I don't recall because at that time I don't know if I went from the office or from a room that Uncle Dong share with

12:07:57 12:08:32 12:09:02 12:09:19 12:09:22

somebody. I don't know exactly.
**Q** Uncle Dong shared a room with somebody?
**A** Correct.
**Q** Where?
**A** On Langdon, Houston.
**Q** Is that a house?
**A** He share a room in a house.
**Q** Did you find out about Uncle Bao being robbed that day?
**A** He called me. I was at the airport.
**Q** So the answer is, yes, you found out?
**A** Yes, because my uncle -- Uncle Bao call me.
**Q** Was Uncle Bao really your uncle?
**A** Well, because he is older than me and our tradition, we call them by -- for likeness uncle.
**Q** So he wasn't your real uncle?
**A** No.
**Q** How much did Uncle Bao have on him at the time he got robbed in broad daylight in the yard next to US Tours?
MR. VARNADO: Judge, I just have to object to the relevance of this whole line of questioning --
THE COURT: Sustained.
MR. VARNADO: -- to this proceeding.
THE COURT: Sustained.
BY MR. HAYNES:
**Q** The money that he was robbed of came from US Tours, did it

not?

MR. VARNADO: Same objection.

THE COURT: Sustained.

MR. HAYNES: If the prosecution's objections and the Court's ruling prohibits me from going into this --

THE COURT: No more argument. Next question, please.

MR. HAYNES: May I have an ongoing objection?

THE COURT: I don't know what you're ongoing to. This was just a specific question he objected to. Let's ask another question if you got one.

MS. PHAN: Sorry. Permission to --

THE COURT: Sure.

(Discussion off the record between Mr. Haynes and Ms. Phan.)

BY MR. HAYNES:

**Q** One of the things I want to ask you about, Mr. Huynh, is during the period of time that you were with -- doing business with Alan Golbert, did he want you to send money from him to Canada, just "yes" or "no," please?

**A** Yes.

**Q** And what did you do when Alan Golbert asked you to send money for him to Canada?

**A** I told him, "Let's see."

**Q** And did you make any calls for Alan Golbert in an effort to send money for him to Canada?

12:11:31 12:11:50 12:12:22 12:12:44 12:13:16

**A** Yes.
**Q** And who did you call?
**A** I call one of the client's --
**Q** I beg your pardon?
**A** I call one of our client's name Hien, H-i-e-n.
**Q** Is that the only person you called?
**A** Correct.
**Q** Because you never called Uncle Dong on any -- about any of the requests that Alan Golbert had made of you, did you, sir?
**A** Correct.
**Q** Now, one of the things -- at some point in time after you became the manager of US Tours in Houston, you became acquainted with a person by the name of Mai Le, did you not?
**A** I was introduced by Uncle Dong.
**Q** I didn't ask you who introduced you. I said at some time you became acquainted with her, didn't you? Is the answer to that "yes"?
**A** Yes, I did.
**Q** All right. When did you claim -- when do you now claim that Uncle Dong introduced you to Mai Le?
**A** When I work in Houston.
**Q** Yes. Can you be a little more specific, Mr. Huynh.
**A** When I first start in Houston -- start working in Houston.
**Q** But you first started after the US Tours and Remittance Company in Houston had been opened for a while, didn't you?

**A** Yes.
**Q** Where do you claim you were at a time when Uncle Dong introduced you to Mai Le?
**A** I'm in Houston.
12:13:47 **Q** Yes. Anyplace in particular in Houston?
**A** At the office.
**Q** Day or night?
**A** Day time.
**Q** Was Mai Le with anybody?
12:14:03 **A** I never met her. I got a call from my uncle saying that whenever I get a call from Mai Le, then I had to help Mai Le.
**Q** I see. You never personally met the lady?
**A** Never.
**Q** You were told, according to you, by Uncle Dong that, if you
12:14:44 got a call from Mai Le, to talk to her?
**A** Correct.
**Q** And looking at the tape recordings that exist between -- of conversations -- telephone conversations between you and Uncle Dong, I don't see any telephone conversation between the two of
12:15:07 you where the -- where a code number was used. Am I right about that?
THE INTERPRETER: Co-number? Excuse me?
THE COURT: Code, code number.
BY MR. HAYNES:
12:15:20 **Q** Did Uncle Dong ever use a code number when he was talking

to you?
**A** No.
**Q** Did you have conversations with Mai Le, though, after the time that you began to talk to her on the phone?
12:15:42 MR. VARNADO: Your Honor, this has all been asked and answered.
THE COURT: Sustained.
MR. VARNADO: It's cumulative. The witness has testified that he talked with Mai Le over the phone. This is
12:15:52 not going anywhere it's purely cumulative.
BY MR. HAYNES:
**Q** Did Mai Le use a code when she was talking to you?
**A** Yes.
**Q** Code.
12:16:22 **A** Yes.
**Q** How many code numbers did she use when she was talking to you?
**A** Four or five.
**Q** Could you tell us what they were, please?
12:16:35 MR. VARNADO: Object to the relevance of that, Your Honor.
THE COURT: Sustained.
MR. HAYNES: If the Court please --
BY MR. HAYNES:
12:16:49 **Q** Was the purpose of the -- the purpose of the code was to

permit you to know the identity of the caller?

**A** I don't quite understand the question.

**Q** What was the purpose of the code that she gave you four or five times?

12:17:16 **A** Well, she call me and told me that, for instance, Duc, D-u-c, has only one dollar; and she explain to me that code mean -- that code "one dollar" mean one hundred grand, $100,000.

THE COURT: We're going to break for lunch, ladies and gentlemen. I'm sorry that it's taking so long. But remember my instructions: Don't talk about the case with each other or with anybody else. And be back in the jury room at 1:30, please, 1:30.

12:18:22

(Court recessed at 12:18 p.m.)

(Court resumed at 1:38 p.m.)

01:38:09 THE COURT: Please be seated, ladies and gentlemen.

MR. HAYNES: May I proceed, Your Honor?

THE COURT: Yes, you may.

MR. HAYNES: May I approach the witness?

THE COURT: You may.

01:38:19 BY MR. HAYNES:

**Q** I'm going to show you here, Mr. Huynh, what's marked for identification purposes as Defendant's Exhibit 18, ask you to look at it and see if that's not your signature there at about midway it looks like a v-e-s. Is that your signature?

01:39:00 **A** Yes, that's mine.

MR. HAYNES: We would offer into evidence, if the Court please, Defendant's Exhibit 18.

MR. VARNADO: No objection.

THE COURT: Defendant's 18 is admitted.

01:39:21 BY MR. HAYNES:

**Q** Now, what I want you to look at --

MS. PHAN: Can we dim the lights a little?

MR. HAYNES: That's okay.

THE COURT: Ms. Tippen, could we --

01:39:30 Is she there?

THE CASE MANAGER: Yes.

THE COURT: Could we turn them down a little bit, please.

BY MR. HAYNES:

01:39:44 **Q** What you just looked at, Mr. Huynh, and identified is where we're pointing the pencil at here, the -- at Defendant's Exhibit 18, which we offered into evidence, and you've identified that as your signature, have you not?

**A** Yes, that's correct.

01:40:06 **Q** All right. Now, directing your attention to the document itself, what is it, sir?

**A** This the receipt to send money from the office.

**Q** From the office of US Tours?

**A** Yes, that's right.

01:40:24 **Q** What's the date? Can you see it up there where it says the

date?
**A** June 6, '03.
**Q** So June 6th of '03 is the date that you signed to send that money?
01:40:40 **A** Yes, that's correct.
**Q** And by the way, it's from the Houston office, is it not?
**A** That's correct.
**Q** Let me show you here what's marked for identification purposes as Defendant's Exhibit 19, ask you to look at that and
01:41:05 see if that's not your signature right there. I'm asking you your signature. Is that your signature or not?
**A** That's correct.
MR. HAYNES: We offer, if the Court please, Defendant's Exhibit 19, which is a two-page -- or three-page
01:41:27 document.
THE COURT: What's the number?
MR. HAYNES: 19, Your Honor.
MS. PHAN: Four, 4-page document.
MR. HAYNES: 4-page document.
01:41:44 MR. VARNADO: No objection, Your Honor.
THE COURT: Defendant's 19 is admitted.
BY MR. HAYNES:
**Q** Mr. Huynh, the document you just looked at and recognized your signature on is what kind of a document, please? See,
01:42:12 that's your signature.

MS. PHAN: Tell him to go to the last page, page four. That looks like that's it.

BY MR. HAYNES:

**Q** Yeah, page four. What kind of a document is that, sir?

01:42:38 MR. SINGLETON: He didn't answer the question.

BY MR. HAYNES:

**Q** That is your signature?

**A** Yeah, that's my signature.

**Q** And what kind of a document is that?

01:42:46 **A** Can I see the other part that's missing on the screen?

**Q** Yes, sure.

MS. PHAN: The other pages?

MR. HAYNES: No. The other part that's missing on the screen.

01:42:56 BY MR. HAYNES:

**Q** Does that help you?

**A** I think this the list -- this the list report of the company.

**Q** And it's a document that you prepared?

01:43:22 **A** No, I did not.

**Q** Who prepared it?

**A** I don't know who did it. I don't remember. It's been a long time.

**Q** Why did you sign it?

01:43:35 **A** Because that person gave me the money. I signed to receive

the money.
**Q** This looks like several persons gave you the money.
**A** Yes. But this person work for the office in Houston.
**Q** This person worked for the office in Houston?
01:44:01 **A** Yeah, for sure.
**Q** You said you were in Houston when you signed it?
MR. VARNADO: Objection, Your Honor. Misstates the witness's testimony.
THE WITNESS: No, I did not work in Houston. But at
01:44:15 that time, I were present at Houston.
BY MR. HAYNES:
**Q** At that time, you were present in Houston?
**A** Yes. Yes, I think so.
**Q** Well, you were in Houston when you signed the thing, right?
01:44:33 **A** According to this, yes, I did.
**Q** Well, according to that, that's your signature and you recognize the document, don't you?
**A** But this the report of the company. Whenever you receive the money from the customer, you do this report.
01:44:58 **Q** All right. Look at this here --
THE COURT: Why don't you just show him the whole thing? That might -- he might be clearer on it if he saw the whole document.
MR. HAYNES: I think so.
01:45:15 //

BY MR. HAYNES:
**Q** Let me show you this page of the exhibit which I think, Mr. Huynh, you've already looked at and you're looking at it now on the computer. What does that indicate down there, sir? First of all, that's your handwriting on that page, is it not, sir?
**A** Yes, that's my handwriting.
**Q** And that date up there, November 12, '02, is a date you put on there, isn't it?
**A** Yes, that's correct.
**Q** And that's a document that you prepared totally, is it not?
**A** No, I did not do this.
**Q** You did not prepare that document?
**A** No.
**Q** Is there any way to look at any of those spreadsheets and find out who prepared them?
**A** If there's just this page only, I don't know who prepared it. But on that page, the employee, she's the manager at the Arlington office. She's the one that prepared that.
**Q** I thought you said you prepared that, sir?
MR. VARNADO: Objection. Misstates the witness's testimony.
THE WITNESS: No, I did not.
BY MR. HAYNES:
**Q** Did you say -- you did -- excuse me, Mr. Huynh. Is that

your handwriting or not, sir? I apologize.
**A** Yes.
**Q** That's your handwriting?
**A** That's correct.
01:47:02 **Q** And you put it on there at the time to indicate the transaction on November 12th of '02, didn't you?
**A** Yeah. I did not prepare that one because at that time someone gave me the money; but that right there, that the person Trinh, T-r-i-n-h, she the one that received the money. She is
01:47:31 an employee. She's the manager at the Arlington office.
I think she had worked at the Houston office before I arrived there in Houston office. I'm very sure.
**Q** You're very sure that she worked at the Houston office before you arrived here?
01:47:52 **A** Yes, that's right.
**Q** So what you're saying is that these documents don't prove that you were working in Houston -- the Houston office November of '02?
**A** No, I did not work there at that time.
01:48:09 **Q** Where were you working in November of '02 then if you weren't working in the Houston office?
**A** I worked in San Francisco.
**Q** Why are you signing the papers here in Houston?
**A** One time I was in -- I was working in San Francisco. And
01:48:27 then, Uncle Dong told me to go to the Arlington office to

install the network because the network has problem and it fail. And when I finish that, I went to Houston to look over because Uncle Dong wants me to come to Houston to look over, see if anything needs to be fixed, the computer and stuff.
01:49:00 **Q** And you fixed the computers?
**A** No.
**Q** Was the computer still broke?
**A** I think at that time the computer did not have any problem in the Houston office.
01:49:19 **Q** So you came to Houston to check the computer. Why are you signing off on --
**A** Uncle Dong want me to do that.
**Q** I didn't ask you who wanted you to do that, sir. I asked you if you came to Houston to look at the computers, why you 01:49:39 spending some time signing off on money transaction accounts?
**A** Well, this what I tell you: According to me, I know Ms. Trinh, T-r-i-n-h, was working there. And then, Uncle Dong, he's the one managing the office there.
Sometime Uncle Dong not present there at the 01:50:06 office. And then, the employee, he's the one who receive the money and turn over to me; and I signed the receipt to indicate that I have received the money.
**Q** One of the things -- if you look at the left-hand corner there, Mr. Huynh, it indicates, does it not, that it is a 01:50:31 Houston report? Isn't it, sir?

01:50:41 01:50:53 01:51:15 01:51:39 01:51:53

MR. VARNADO: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

MR. VARNADO: He explained that circumstance, when he signed the document and why.

THE COURT: Sustained.

MR. HAYNES: I'm just trying to get him to identify the document as being a Houston report.

THE COURT: I think he's already done that.

BY MR. HAYNES:

**Q** I thought that you told us yesterday that the first time you came to Houston was in December of 2002 and you came down here to just install cameras. Is that -- is that accurate?

**A** Yes. But I don't remember exactly those times what I did.

**Q** I beg your pardon?

**A** Well, I don't remember if I was there at that time, if I was there. But I remember Uncle Dong told me that once --

**Q** I apologize to you.

**A** -- to go to Arlington to fix the computer.

**Q** I apologize to you. I am not asking you what you say Uncle Dong told you. Fair enough?

**A** Because I want to tell you so you can understand why I was there.

**Q** Yes, sir.

And do you think that by you adding on to every

answer you give me that "Uncle Dong told you" --

MR. VARNADO: Objection. Argumentative.

THE COURT: Sustained.

MR. HAYNES: I think it is, Judge.

01:52:09 BY MR. HAYNES:

**Q** Now that you've looked at it, does it refresh your memory that on November the 12th of 2002 you're in Houston and you signed off on a remittance receipt?

**A** That's correct.

01:52:47 **Q** One of the things that I asked you about earlier, Mr. Huynh, was when you -- was when you took money from Mr. Alan Golbert and -- or had you -- your kinfolks out in California to send it to someplace in Texas for you. Do you remember that?

THE INTERPRETER: I apologize, counsel. I cannot hear

01:53:09 you.

BY MR. HAYNES:

**Q** Do you remember that line of questioning?

THE INTERPRETER: I apologize, counsel. I cannot hear you.

01:53:14 BY MR. HAYNES:

**Q** Do you remember the questions put to you about you calling your kinfolks out in California asking them to send money that Alan Golbert was going to give you to Houston? Do you remember that conversation this morning?

01:53:44 **A** Well, I didn't say anything about helping my countryman to

01:54:07 01:54:34 01:55:10 01:55:31 01:55:53

send money to Vietnam.
**Q** No. I'm sorry. I was talking about when Mr. Alan Golbert came in to see you in Houston, he wanted you to have some money sent from California to Houston and you called your kinfolk out in California and got him to agree to help Mr. Golbert. Do you remember that?
**A** Yes, I remember.
**Q** And I asked you this morning if you had any conversation where the man in California, your kinfolk, told you to put the money in his brother's account. Do you remember that?
**A** Can you ask me the question again, please?
**Q** When you agreed to send money for Alan Golbert from California to Texas, you called your kinfolks out there in California. Do you remember that?
**A** Yes, I remember.
**Q** What's the name of the kinfolk that you called?
**A** His name is Truong Nguyen, Truong, T-r-u-o-n-g; Nguyen, N-g-u-y-e-n.
**Q** And he is related to you by blood or marriage?
**A** That person is the husband of my aunt.
**Q** And you asked him if he would send Alan Golbert's money from California to Houston, did you not?
**A** Yes, that's correct.
**Q** And in one of those conversations, you talked about paying him a commission, did you not?

**A** Pay who?
**Q** Nguyen Truong?
**A** I did not pay any commission to that person.
**Q** Did you talk to him about him being paid a commission?
01:56:13 **A** No, I did not.
**Q** Could we play that?

MS. PHAN: Yes. At this time we would like to play an audio for him to listen to. It's marked as Defense Exhibit 20.

MR. HAYNES: Defendant's Exhibit 20, an audio, Your Honor.
01:56:30

MR. VARNADO: Your Honor, I don't know what it is. It's certainly not in evidence. He needs to lay a predicate.

MR. HAYNES: We got it from the Government.

THE COURT: Well, you-all need to approach the bench.

01:56:55 MR. HAYNES: We got it from the Government.

(At side bar.)

THE COURT: What is it? Where did it come from? What is it? And I don't want to hear you tell me it came from the Government. I want to know where it came from.

01:57:10 MR. HAYNES: It's a conversation between this cowboy and --

THE COURT: Which -- I don't believe there are any cowboys in this room. There is one person who has cowboy boots on, but that doesn't make you a cowboy. All right, come on.

01:57:24 MR. HAYNES: Is that a judicial finding?

THE COURT: No. I want you to get to the point.

MR. HAYNES: This guy said he never talked to his -- his cousin, Mr. Truong, whoever it is --

MS. PHAN: His uncle, Truong Nguyen.

01:57:39 MR. HAYNES: -- his uncle, about putting the money, his commission, in his brother's account; and the Government has given us the tape where they did have that conversation where he said, "Put my commission in my brother's account." He's a pharmacist or a doctor or something.

01:57:48 THE COURT: Is it a wiretap? I mean, what is it?

MS. PHAN: Yes, it's a wiretap.

MR. HAYNES: It's a wiretap.

MR. MAGLIOLO: It would be -- if anything, Your Honor, it would be a consensual recording. It wouldn't be a wiretap. 01:57:59 I don't believe -- it still has to be in evidence. Before we can play it, we need to get it into evidence, Your Honor.

MS. PHAN: Yeah, we can play it to ask him if he recognizes his voice and everything.

MR. VARNADO: Just lay a proper predicate.

01:58:11 MR. HAYNES: All he has to do is listen to it and if he recognizes his voice, like they did before, we can play it.

MS. PHAN: If the Government has a question about which call it is, we can give them the call session number and all that information that they gave to us on it because all the 01:58:24 calls came with a session number.

01:58:36 THE COURT: You can start playing it. Don't put the transcript on the screen. Start playing it, see if he recognizes the voices.

MR. HAYNES: We'll play it line by line.

THE COURT: No. Just don't put the -- just play it.

MR. HAYNES: Okay, all right.

MS. PHAN: Okay.

(Side bar concluded.)

BY MR. HAYNES:

01:59:12 **Q** Mr. Huynh, I'm going to play a tape recording for you. I want you to listen carefully to the speakers and see if you can identify the speakers. Do you understand that question -- or that statement?

**A** Yes, I understand.

01:59:34 **Q** All right.

MR. HAYNES: Could you start the thing off so that he might get a chance to listen and see if he can identify the speakers.

01:59:57 (Defendant's Exhibit Number 20, audio recording, was played in open court.)

BY MR. HAYNES:

**Q** Do you recognize the voice there?

**A** That's Uncle Nguyen and me.

**Q** And you're the other voice?

02:00:30 **A** Yeah, that's correct.

Q And could you tell from what you heard so far was that you calling Uncle Truong?
A No.
MS. PHAN: Truong.
MR. HAYNES: What's his name?
MS. PHAN: Truong Nguyen.
BY MR. HAYNES:
Q Nguyen. Are you calling him or is he calling you?
A No, I don't think I call him.
02:00:45 Q You can't tell from what you heard?
A I think she -- he's the one calling me.
MR. HAYNES: Could you turn it on please, start from the beginning.
(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)
02:01:18
BY MR. HAYNES:
Q Is that you saying, "Yeah, yeah, yeah, yeah"?
A (In English.) That's somebody else. That's somebody else.
(Through interpreter.) Yeah, yeah, that's -- yeah, yeah, yeah, that's not me.
02:01:28
BY MR. HAYNES:
Q Okay. When is it that your kinfolk comes on that you're talking to in California?
A In that phone call, Uncle Nguyen called me.
02:01:42 Q Do you remember the phone call?

**A** And there's this unknown person asked me -- somebody answer the phone, say, "Yeah, yeah, yeah," which is "Yes, yes, yes."

MR. HAYNES: All right. Could you play the rest of it please.

02:01:57 BY MR. HAYNES:

**Q** Listen to it please and see if you recognize the conversation.

(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)

02:02:00 BY MR. HAYNES:

**Q** Do you recognize the voices speaking there?

**A** Yes, I know.

**Q** And is it you the voice of -- do you recognize your voice?

**A** Yes.

02:02:59 **Q** And do you represent -- do you recognize Mr. Truong's voice?

MS. PHAN: Truong's voice. Nguyen. Nguyen Truong.

BY MR. HAYNES:

**Q** Nguyen Truong?

02:03:19 **A** Yes, I have.

**Q** And was this a call as you recall -- as you think about it that happened the 23th of May -- of February, rather, of 2004?

THE INTERPRETER: I'm sorry?

BY MR. HAYNES:

02:03:35 **Q** 23rd of February of 2004?

**A** I don't know the dates. I don't know.
**Q** Okay. Is it possible for you to read the Vietnamese of the conversation and then follow along with me as I ask you questions? Would that be reasonable?
02:03:55 **A** I don't understand what you said.
**Q** I have the conversation in Vietnamese. It's written in Vietnamese. Can you read Vietnamese?
**A** Yes, I can.
**Q** So is it possible that you could listen to that tape?
02:04:13 MR. VARNADO: Your Honor, I just object to the use of this transcript. We don't have any idea what it is or what it says or it is a transcript of the conversation at all. Object to it being used.
MS. PHAN: He can verify it since he can read
02:04:28 Vietnamese whether or not it's a transcript of -- that it's audio in Vietnamese.
MR. HAYNES: Our interpreter can.
MS. PHAN: He can look at it and see. Couldn't he identify that Vietnamese --
02:04:35 THE COURT: Well, maybe he should just listen to the -- he should listen to the tape and tell us what it means line by line. Maybe the translator can do that.
MR. HAYNES: All right.
MS. PHAN: You want the translator to translate?
02:04:46 THE COURT: Yes.

02:04:54 02:05:14 02:05:28 02:05:31 02:05:42

MS. PHAN: Okay. Let's do that.

MR. HAYNES: Mr. Translator, if you would --

THE INTERPRETER: Yes, sir.

MR. HAYNES: -- we will play the --

THE INTERPRETER: Can --

THE COURT: Why don't you go over there and speak into one of those microphones and tell us line by line what's being said.

MR. VARNADO: Your Honor, I would object to the translator reading the transcript.

THE COURT: Yeah. No transcript. I just want the translator to do it from what he hears on the tape. Don't look at the transcript.

MS. PHAN: Should I write down on the board what he says?

THE COURT: No. I just -- I just want him to translate what is being said.

(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)

MS. PHAN: Stop it.

SPECIAL AGENT JOHN CHIUE: Do you want me to start it over?

MS. PHAN: Yeah. We're doing line by line. So you have to pause it after every line. Let me do it.

(Defendant's Exhibit Number 20, audio recording, continued

to be played in open court.)

THE INTERPRETER: Yeah, this is Nguyen.

(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)

02:06:08 THE INTERPRETER: Can I see you, Duc?

THE COURT: You may sit down.

THE INTERPRETER: Hello.

THE DEFENDANT: Can you hear it?

BY MR. HAYNES:

02:06:35 **Q** Can you tell, Mr. Huynh, that that's you and --

(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)

THE COURT: He's already recognized the voices. He knows who's talking.

02:06:48 MR. HAYNES: All right.

THE COURT: All right. You told him what it was. All I want to happen now is to play the thing line by line and let the official court translator translate for the jury what is being said.

02:06:57 MR. HAYNES: Fair enough, Your Honor.

THE COURT: So let's not ask him questions while he's doing that.

MR. HAYNES: I agree.

THE INTERPRETER: I cannot hear it clearly, Your Honor. I don't think I'll be able --

02:07:13

MS. PHAN: Is it better if I put it on my computer speaker? I can do that. Because I think it's so loud --

THE INTERPRETER: Maybe if I can put on some earphones.

02:07:27 THE COURT: Yes. Why don't you put the earphones on. That will be great. We got some earphones. That would be super.

THE INTERPRETER: I can some headphones.

MS. PHAN: Headphones?

Does the Court have some headphones? I'm so sorry.

THE COURT: Do we have any headphones?

Does the court reporter have some headphones? I see some right there.

THE COURT REPORTER: Where?

THE COURT: Right there.

THE COURT REPORTER: Those aren't mine.

THE COURT: I don't think that's a headphone.

THE INTERPRETER: Your Honor, is it okay since she 02:08:08 already has it translate if I --

THE COURT: No. Because I want you to translate. You are an official translator. Although I know counsel speaks fluent Vietnamese, she's not an official translator.

MS. PHAN: No. He's saying not the English version 02:08:20 next to it. Just the Vietnamese in Vietnamese so that he can

verify that that's what's being said. It's easier to follow.

THE INTERPRETER: Yes, Your Honor.

MR. VARNADO: Anything to move this along, Your Honor.

THE COURT: All right. Yes, that's fine. The Vietnamese version.

MS. PHAN: Do I need to --

THE COURT: Just hand it to him.

(Defendant's Exhibit Number 20, audio recording, continued to be played in open court.)

THE INTERPRETER: It is the correct Vietnamese.

THE COURT: Is it correct? Okay. Would you translate that transcript that you say is correct to the jury, please?

THE INTERPRETER: Yes, Your Honor.

THE COURT: And just say who is speaking.

THE INTERPRETER: Yes, Your Honor.

Hello.

Nguyen: Oh, this is me. Can I see Duc, please?

Yeah, yeah. Yes, yes.

Duc: Hello.

Nguyen: That's you?

Duc: Yeah, yes.

Nguyen: What about the 25, you got anything?

Duc: Yes. I wait for him to call me back to give me the stamp and I didn't see it yesterday. Hey, he hadn't called Uncle Nguyen yet.

Nguyen: Oh, yeah?

Duc: Yes. But someone had pick up ten for El Monte. I don't know if you know it.

Nguyen: I don't know.

02:12:28 Duc: Oh, yes?

Nguyen: Drug, ten, huh?

Duc: Yes. Yeah, he says he's on the -- it's below. Yeah, I told him so. But Duc, he didn't hear anything. But he ask for 1.5 because up here, he said it's 1.5.

02:12:56 Nguyen: That's correct. That's correct. But have he dropped yet?

Duc: Yes. He dropped yesterday.

Nguyen: Yeah, he dropped El Monte ten.

Duc: Yes. He dropped here and pick up from El Monte. 02:13:20

Nguyen: No. Yes, yes. It been a long time, been a long time.

Duc oh, really.

Nguyen: Yeah, it's been several months, been a long time. 02:13:33

Duc: Oh, yes? But the office say they don't know. Nobody calling 1.8. And if someone calling 1.5, then we figure out later.

Nguyen: Yeah, that's correct. Uncle Nguyen say 1.5. It's been a long time. 02:13:54

02:14:18 Duc: Yes.

Nguyen: Yeah. That's -- that's Kim Huong. They do that in Utah. Do you know that? That's one of the location for -- of Aunt Cang.

Duc: Oh, yes?

Nguyen: Yeah.

Duc: Oh, yeah. They refer over here from there.

Nguyen: Yes, okay. Yeah. Let me tell him -- let me tell him to prepare. Do you have the name yet, Duc?

Duc: Yes. Can you wait for a minute? Yes, I have now.

Nguyen: Oh, what's the name?

Duc: The name is Tat, Nguyen Tat.

Nguyen: Okay. What's the phone number?

Duc: The phone number is (626) 695-2753, yes.

Nguyen: Okay. Duc, you can deposit your into the bank of the Cali Remittance. Can you do that for me?

Duc: Oh, you want me to deposit into the California account?

Nguyen: Yes, deposit to Cali account.

Duc: Oh, you -- do we need to have his drive license?

Nguyen: Yeah. It's better -- it's better if you have it.

And Duc say: The drive license is JA798342.

02:15:53 02:16:27 02:16:46 02:16:55 02:17:04

And Nguyen: Okay, I got it.
Duc: Okay. I will fax you after I deposit.
End of conversation.
MR. MAGLIOLO: May we approach a minute, Your Honor?
THE COURT: Yes.
(At side bar.)
MR. MAGLIOLO: The Government's a little confused. This is supposed to be, I assume, some type of impeachment evidence. There's certain requirements that the Court -- that the law requires before this would be admissible. We have now got something before a jury that the Government has not seen any impeachment value in.
The information that counsel for the defense gave the Court that was going to be in there is clearly not in there. There's nothing about the commission being paid to the gentleman in California. So --
THE COURT: Yes. What's the purpose?
MR. MAGLIOLO: -- we're at a loss to understand what's -- what we're doing here other than wasting time, Your Honor.
MR. HAYNES: We're not wasting time. That was provided for us by the Government.
THE COURT: Wait, wait, wait. That's not a response to an objection.
MR. HAYNES: All right.
THE COURT: Okay. That's not a good response. Tell

02:17:13 me how this impeaches what he just told you about the commissions?

MR. HAYNES: Well --

MS. PHAN: Okay, here. Can I explain?

MR. HAYNES: Yeah, it doesn't. She gave me the wrong tape.

MS. PHAN: It's the next one. I did it out of order.

MR. HAYNES: That does show that he was engaged in the side business.

02:17:22 THE COURT: Okay. But he's already said that.

MS. PHAN: No, no. He's admitted -- what he's said so far is he admitted --

MR. VARNADO: Keep your voice down.

MS. PHAN: He's admitted he did side business with the

02:17:34 CW only and he's making money with the CW. This shows --

THE COURT: Then you were offering it for what you said you weren't doing.

MR. VARNADO: Right.

MR. HAYNES: That's true, Judge.

02:17:41 MS. PHAN: I just played it out of order.

THE COURT: This is like 15 minutes of just nothing.

MR. HAYNES: I didn't think it was just nothing, Judge, but I can understand it.

THE COURT: Well, it's a waste of time is what it is.

02:17:54 MS. PHAN: Well, it was the next call I was supposed

to put on.

THE COURT: So we're supposed to go through this charade for the next call, too?

MR. HAYNES: It's a short call, Judge. We'll do it by
02:20:54 the interpreter.

MS. PHAN: Yeah. The next call is a lot shorter.

THE COURT: This was supposed to --

MR. VARNADO: How much more of this do we have? I think that's fair for us --

02:20:58 THE COURT: How many more of these are we going to have? I mean, really, this is not the way you do it.

MR. HAYNES: It depends on what he'll admit. If he'll admit to some of things that he did, then we wouldn't have to do it. He won't admit it.

02:21:10 MR. MAGLIOLO: If it please the Court, just in the interest of speeding this thing up, my understanding the way you impeach somebody is you ask them if they made a statement and they said no -- and he has said that relating to the commission -- then play him that specific part about the commission. Then
02:21:24 -- and ask him, you know, did he -- does it refresh his recollection as to what it is -- it did or not. And he can say "yes" or "no." That's the way you --

MR. HAYNES: I know how to do it.

THE COURT: We don't have to play the whole tape.

02:21:38 MR. MAGLIOLO: Exactly. It's just the area as to the

02:21:48 impeachment, Your Honor. First, you got -- when you're impeaching with a prior inconsistent statement, you got to let him hear the statement and let him -- and ask him if that refreshes his recollection, did it happen; and it's pretty straightforward. Playing all these tapes is not --

THE COURT: The way to do it.

MR. VARNADO: Is a good use of anybody's time.

MR. MAGLIOLO: Yeah. And it's not proper impeachment on the prior inconsistent statement.

02:22:00 MR. HAYNES: Now, I understand the predicate is what he's talking, I think.

THE COURT: All right. We got one more, right? Because, I'm telling you, this whole line of questioning about his side businesses and these other people and whether they paid

02:22:10 a commission or didn't, I really fail to see what the relevance is.

MR. HAYNES: But he denied it. So it's impeachment.

THE COURT: Yeah. But you know, if you say "I had a wreck and there was a woman in a blue dress next to the stop

02:22:24 sign" and actually she was wearing a yellow dress, I mean, yeah --

MR. MAGLIOLO: Five years ago, Your Honor.

THE COURT: -- five years ago, you can impeach somebody that way; but it's not on anything that's material to

02:22:36 the case.

MR. HAYNES: I know the California case where there was a guy claimed a Yellow Cab with a black man in it and that's the basis of the --

THE COURT: That's not what I did. Okay? That's not what I said. And you know my point. You're much, much more experienced than anybody else in this courtroom. You know what I'm talking about. This is really, really bordering on the irrelevant and immaterial.

MR. HAYNES: I'll speed it up, Judge.

THE COURT: All right.

(Side bar concluded.)

BY MR. HAYNES:

**Q** Okay. Mr. Huynh, in order to facilitate things, let me ask you this: Did you tell our jury earlier that you did not do any side business with anybody other than Mr. Alan Golbert, "yes" or "no"?

**A** Yes, that's correct.

**Q** Did you do side business with people other than Mr. Alan Golbert, "yes" or "no"?

**A** No.

**Q** Direct your attention to a point in time I asked you about a little earlier.

MR. VARNADO: Your Honor, I just -- technically, you cannot impeach with something extraneous like this. He's bound by the answer. We should move on to the next topic.

MR. HAYNES: I haven't asked him about this, counsel. I apologize to you.

MR. VARNADO: I believe you just asked him did he do any other side business. The answer was no. Under the rules you're bound by the -- you're bound by the answer. That's the Government's position.

MR. HAYNES: This is not about the side business, counsel.

Maybe I can straighten it out.

THE COURT: Are you going to ask him about this tape --

MR. HAYNES: Yes, I am, Judge.

THE COURT: -- the one that was just played?

MR. HAYNES: No, ma'am. I'm going to the one that has to do with the impeachment issue, period.

THE COURT: All right. Continue.

BY MR. HAYNES:

**Q** I'd asked you earlier if you had not agreed with your -- Mr. Truong that you would send his commission for Mr. Alan Golbert's money transaction to a Mr. Truong's brother. Do you remember that question being put to you?

THE INTERPRETER: I'm sorry, counsel.

BY MR. HAYNES:

**Q** Sure. Did you have a conversation with Mr. Nguyen Truong concerning Mr. Alan Golbert's request to send money from

California to Texas?
**A** Yes, that's correct.
**Q** Did you in that conversation talk to Mr. Truong about putting the money which would be his commission in his brother's bank account?
**A** No, I did not.
MR. HAYNES: Can we play that, please.
BY MR. HAYNES:
**Q** I'm going to play you part of a conversation between you and --
THE COURT: Well, wait a minute. We're going to find out whether -- who it's between. He's going to tell us if he recognizes the voices.
MR. HAYNES: This is cross examination but I can still ask him.
THE COURT: No. We're just going play it -- play the part and see if he recognizes who's talking.
BY MR. HAYNES:
**Q** See if you recognize the voices on this tape.
(Audio recording played in open court.)
BY MR. HAYNES:
**Q** Does Uncle Nguyen have a brother named Phu, P-h-u, Phu, P-h-u?
**A** Yes, that's correct.
(Audio recording played in open court.)

BY MR. HAYNES:
**Q** Do you recognize the voices?
**A** That's my voice and Uncle Nguyen's voice.
**Q** And that's the man we've been talking about in California?
02:25:05 **A** Yes, that's correct.
**Q** And this is the man I asked you about if you'd agreed to split a commission with him?
**A** I don't split any money with him.
**Q** And you paid him no commission you said?
02:25:23 **A** No, I did not pay anything.
**Q** And you told us that you did not agree to put his commission in his brother's account?
**A** No.
**Q** Well, one of the things you wanted to do was to hide it
02:25:41 from Mr. Nguyen's wife, Nga?
**A** I don't know what you're talking about.
**Q** Listen to this.
(Audio recording played in open court.)
MS. PHAN: At this time we ask that the translator do
02:26:14 the thing again and translate.
THE COURT: Not the whole thing, just a part.
MS. PHAN: It's really short.
THE COURT: Just a part.
MS. PHAN: Yeah.
02:26:21 THE COURT: Show him where.

02:28:44 02:29:07 02:29:30 02:29:46 02:30:11

(Audio recording played in open court.)

MS. PHAN: Can you switch speakers when you do the translation, if it's Duc saying that or Nguyen Truong saying that?

THE INTERPRETER: Yes.

Nguyen: Hello. US Tours.

Duc: Hello. Uncle Nguyen, yeah, this is me.

Nguyen: Yes.

Duc: Uncle Nguyen, if you can get me the account of the other, I already done that. What about the other one? What do you want to do? About the Metro Bank.

Nguyen: Well, it's not here yet. Okay. Let me see. Can you hold on a second?

Duc: Yes.

Nguyen: Okay. Let me try to call -- let me try to find out.

Nguyen: Hello.

Duc, yes.

Nguyen: Oh, it's not here yet. Actually, it should be arrived here. I've been order for -- for weeks and it's not book yet.

Duc: Oh, if they haven't booked it yet, forget it.

Nguyen: Oh, it's here but I don't know the account number. Phu, he's not -- he was unclear but he wanted

02:30:43 02:31:03 02:31:22 02:31:36 02:34:46

to make sure the -- that number, what it is, that number is.

Duc: A lot of time we got to the end of the month and we don't have enough time to put it in.

Nguyen: It's only ten. Why not? Why can't you do it?

Duc: No, 12. Yeah. We declare 12. Remember the day before?

And then Nguyen: Yeah, that's right.

Duc: Yeah. Two or three days -- two days you can put in there, you know.

Nguyen: That's okay. Don't worry about.

Duc: Yeah, for sure. I will wait for more.

Duc: Okay. If anything, I will call you.

Duc: Yes.

Nguyen: If they have the report, I will let you know right away.

Duc: Okay. Okay.

MR. MAGLIOLO: May we approach the bench again, Your Honor?

THE COURT: Yes, you may.

(At side bar.)

THE COURT: Is this the wrong tape, too?

MS. PHAN: No, Judge.

MR. MAGLIOLO: Same observation as before, Your Honor.

MR. VARNADO: A complete waste of time over -- it

didn't --

THE COURT: There is nothing in there that contradicts what he said.

MS. PHAN: Your Honor, this is the phone call -- what it states in there is that Duc is asking for an account number to put money in and it's Phu's account number who Duc has stated is Uncle Nguyen's brother.

THE COURT: Well, I didn't hear that. I didn't hear anything about that.

MS. PHAN: He did. He said he put it in Phu's account.

THE COURT: I didn't hear him say that.

Did you hear him say that?

MR. MAGLIOLO: No, no.

MR. HAYNES: I did because I was listening for it.

MS. PHAN: It's Phu's account.

MR. MAGLIOLO: I can't hear, I'm sorry.

MS. PHAN: But he didn't know the account number. And Phu said carefully and I want to make sure that the account number is correct.

MR. MAGLIOLO: This tape hasn't even been identified as a conversation relating to Alan Golbert's transfer of the money, Your Honor.

MS. PHAN: We didn't say -- we said it's relating to Duc putting money in Nguyen Truong's --

MR. VARNADO: Which has nothing to do with anything.

THE COURT: Commission money. That was the question. Commission. There's no "commission" in that whole thing.

MS. PHAN: We're asking him why is he putting money in Phu's account.

MR. HAYNES: No. I thought it was commission money.

MS. PHAN: It is commission money. He would have to admit that; otherwise, why would he put --

MR. VARNADO: Your Honor, you've been more than lenient in allowing this --

THE COURT: I think we just need to get off this right now.

MR. VARNADO: -- to get in the way that it has. And I agree.

MR. HAYNES: If we find a way to make it more relevant, Judge, I'll call it to your attention.

THE COURT: Or admissible. Okay.

MR. HAYNES: I have to have both, Judge?

THE COURT: Yeah.

MR. HAYNES: Thank you.

(Side bar concluded.)

BY MR. HAYNES:

**Q** Mr. Huynh, I take it that listening to the tape did not refresh your memory that at one time you told Mr. Nguyen that you would put his brother -- his commission in his brother's

account?

MR. VARNADO: Your Honor, I'll just object to the question. That's exactly what we just addressed up there and this topic is over.

02:34:28 THE COURT: Yes, the topic is over. Move on to the next topic.

BY MR. HAYNES:

**Q** One of the things that occurred, Mr. Huynh, is that you had to post a bond to get out of jail after you were arrested, did
02:34:52 you not, "yes" or "no"?

**A** You asked me that?

**Q** Sure. After you were arrested in order to get out of jail, you had to post a bond, "yes" or "no"?

**A** That's correct.

02:35:16 **Q** And it was the company that helped you post your bond, wasn't it?

**A** I don't know.

**Q** You didn't put up the money for the bond, did you, sir?

**A** No, I did not.

02:35:37 **Q** And you were released from detention, correct?

**A** Yeah, that's correct.

**Q** And you came to my law office in order to look at what the Government contended was evidence in the case. Do you recall?

**A** Can you ask the question again?

02:36:11 **Q** It's a little difficult. You came to my office on a number

02:36:19 02:36:38 02:36:53 02:37:02 02:37:09

of occasions?

MR. MAGLIOLO: Judge, we're going to have to approach the bench again --

THE COURT: All right.

MR. MAGLIOLO: -- if he's going to be a witness in this case.

(At side bar.)

THE COURT: If he says "no," are you going to get on the stand and testify he did?

MR. HAYNES: He ain't going to say no.

THE COURT: Yeah. But what are you going to do if he says "no"; then move on to the next question?

MR. HAYNES: Yeah. Well, I'll bring some other people in and say he's a cockamamie liar and ask the Court to put him in jail.

THE COURT: Well, I believe he's already there, so we don't have to worry about that.

MR. MAGLIOLO: That's my concern, Judge, is I didn't want to get in the position where the lawyer is going to become a witness and saying things based on his not being a lawyer but being a witness in the case and asking a question based on being a witness in the case as opposed to being a lawyer.

MR. HAYNES: Listen to the question.

MR. MAGLIOLO: I was talking to the Court.

I mean, that's all my concern is.

02:37:15 ... THE COURT: I understand. I have the same concern so --

MR. HAYNES: I know better.

THE COURT: All right, all right.

(Side bar concluded.)

BY MR. HAYNES:

**Q** Mr. Huynh, after you were arrested, you came to the office building where my office was located to see the lawyer who was representing you, did you not?

**A** Yes, I went there several times.

**Q** And during one of the times you were looking at documentation that had been provided for all the Defendants by the prosecution?

**A** That's correct.

**Q** And during that period of time, while you were there you had a conversation with Dong Huynh, did you not?

**A** Yes, I have conversation with him several times.

**Q** I'm talking about one of the times -- one of the last times there in the office building.

**A** I don't remember when was the last time.

**Q** I didn't ask you the date. I'm thinking -- I'm asking you to think about the very last time.

**A** Yes.

**Q** And that's because the two of you got into an argument and a fight, didn't you?

**A** No. We only have an argument, not fighting.
**Q** No, we already had an argument, not fighting?
**A** No, we not -- we did not fight.
**Q** You had an argument on this same day?
02:39:39 **A** That's correct.
**Q** And did the argument cause you to get up out of your chair?
**A** I just left the room.
**Q** And did the argument cause Mr. Dong Huynh to get up out of his chair?
02:39:58 **A** Yeah, he just sitting there.
**Q** And he was mad at you, was he not?
**A** I think so.
**Q** You think so?
**A** Yeah, that's correct.
02:40:09 **Q** Didn't he say something to you at the time that caused you to do more than think that he was mad at you?
**A** Can you ask again?
**Q** Sure. Didn't he say something more to you at the time that caused you to believe that he was more than just a little mad at 02:40:41 you?
**A** I said or he said?
**Q** He said.
**A** Well, if he say something, why he mad at me?
**Q** Didn't he tell you he was mad at you because --
02:41:06 MR. VARNADO: Objection. Hearsay. No exception.

THE COURT: Sustained.
BY MR. HAYNES:
**Q** You knew why he was mad at you, didn't you?
**A** He didn't say he was mad at me; but his attitude, he say -- show that he was mad at me.
**Q** And you knew why he was mad at you, didn't you, just "yes" or "no"?
**A** I don't know why he mad at me.
**Q** You don't know?
MR. VARNADO: Objection. Asked and answered.
THE COURT: Sustained.
MR. HAYNES: Would he ask the witness to hush?
THE COURT: He doesn't have to answer that.
BY MR. HAYNES:
**Q** And since that time, he hasn't said anything to you, has he?
**A** No.
**Q** And since that time, you-all have exchanged barbs by way of the computer, haven't you?
**A** No.
**Q** Did you say -- did he say something that you deemed to be inappropriate about you on the computer?
MR. VARNADO: Objection, Your Honor. He said they didn't exchange anything.
THE COURT: Sustained.

MR. HAYNES: I can ask him about it. If he can deny it, then I can show it to him. Let me see if I can address the issue.

BY MR. HAYNES:

02:42:33 **Q** Was there a time after the argument when he said something on the computer that irritated you?

**A** Yes.

**Q** And did you as a consequence of that irritation fire an answer back on the computer?

02:43:02 **A** Yeah, that's correct.

MR. MAGLIOLO: Again, Judge, we got to approach the bench on this.

THE COURT: All right.

(At side bar.)

02:46:10 MR. MAGLIOLO: I'm assuming that one of the standard conditions on bond is that you not communicate with other Defendants. If he is -- if counsel for Defendant is now telling the Court that his Defendant was communicating -- is violating the Court's conditions, I think that's a serious thing that 02:46:24 we're getting ready to get into.

MR. HAYNES: You want to take it up, Joe, and find out that the Court said that they could talk? They had a joint agreement that was filed and you had a copy of it. I'm shocked.

MR. MAGLIOLO: Okay. If they had a joint agreement, 02:46:36 then I didn't -- I did not recall that; but if they did, that's

different. But I don't think we're talking about a joint agreement about working on the case. It sounds like to me that they're having some -- according to what counsel is saying, some argument.

That wouldn't fit into, I don't believe, something that they could do and argue about the case or having an argument. I'm just -- just making -- again, it's something that I don't want to get out before the jury. I don't know where this is going, but it doesn't sound like -- even if it is and they have a joint defense agreement, communicating barbs back and forth on the computer about what someone should say or should not say I don't think falls into the joint defense agreement exception to them not communicating. Just again pointing it out.

MR. HAYNES: It was after their communication terminated, Joe. That's what he said.

MR. VARNADO: Well, which -- I don't think you can take both positions, that, you know, it's covered here and then not covered there so --

MR. HAYNES: Have you read one of those things lately? They're entitled to work on their case; and if they get in a fistfight during the period of time, they don't have to talk to each other anymore.

MR. VARNADO: So how does that make it relevant or admissible here?

02:47:50 THE COURT: Yeah. What --

MR. HAYNES: It shows that if any witness in a case said he's hostile to somebody else in the case, the accused, or the accused is hostile to the witness, that's admissible because it tends to show the reason for the bias of the witness.

MR. VARNADO: Mr. Haynes has had hours and hours to attempt to prove bias. He's taken his best shot. He's asked if they are angry at each other. They were. That should end it. There is no ability --

02:48:06 MR. HAYNES: That's not the end of it.

MR. VARNADO: -- to put in any extraneous conversation. This has just gone on entirely too long.

THE COURT: I don't think we can put in any extraneous conversation because he just admitted that they had a little altercation on the computer.

02:48:16 MR. HAYNES: I think that's right, Judge; and I'll move on.

THE COURT: We're moving on to the next one, right?

MR. VARNADO: Okay, all right.

02:48:22 MR. HAYNES: I will, Your Honor.

THE COURT: All right.

(Side bar concluded.)

BY MR. HAYNES:

**Q** Mr. Huynh, after the time that you were arrested, the lady whom you were living with and by whom you had two children 02:46:15

opened up a remittance store very close to the remittance store that you worked at here in Houston, did she not, a travel store, excuse me?

MR. VARNADO: I just ask that the question be clarified.

02:46:40

BY MR. HAYNES:

**Q** It is a travel store, is it not?

THE COURT: Agency? Is that what you mean, travel agency.

02:46:48

BY MR. HAYNES:

**Q** Travel agency.

**A** Can you ask the question, please?

**Q** Sure. After -- here's the point in time: After you were arrested, the lady you were living with, the mother of the children, she opened a travel store, did she not, next to where US Tours and Remittance was?

02:47:10

**A** How long after I got arrested?

**Q** Are you -- are you aware that she has opened up a travel store?

02:47:41

**A** Yes. I'm the one that opened the travel agency.

**Q** You're the one?

**A** Yes.

**Q** After the time you had been arrested?

**A** That's right.

02:47:53

**Q** When did you open the travel store?

02:48:29 02:48:49 02:49:18 02:49:48 02:50:06

A February, 2006.
Q What's the name of the travel store?
A Global Tour.
Q How far is it from US Tours and Remittance where you used to work?
A It's only one store apart.
Q On the same street?
A That's right.
Q And did you take with you to that store computer devices from US Tours?
A You mean the computer system?
Q I guess computer devices means a computer system. Did you take any computers from US Tours to put in your store at US Global -- or Global Tour?
A Yes, I did one.
Q Did you take with you -- when you opened the store Global Tours, did you take any business lists from US Tours?
A No.
Q Are you saying you didn't take any lists of the airline companies that provided tickets?
A No, I did not take anything.
Q Just a computer?
A The computer so I can book the ticket.
Q You took how many computers?
A One.

**Q** And did the computer you took have the memory on it of the airlines that US Tours obtained tickets from?

MR. VARNADO: Objection, Your Honor. Asked and answered.

THE COURT: Sustained.

MR. HAYNES: No, I didn't ask him about that, Your Honor, not about the computer.

THE COURT: I sustained the objection.

MR. HAYNES: Thank you, Judge.

BY MR. HAYNES:

**Q** Could you utilize your computer to find out what US Tours -- how US Tours used to do business with the airlines?

**A** No, I never do that.

**Q** How far away from US Tours business did you open your business, Global Tours?

MR. VARNADO: Your Honor, objection. Asked and answered --

THE COURT: Sustained.

MR. VARNADO: -- and the relevance to this entire line of questioning.

THE COURT: Sustained.

MR. HAYNES: It's been asked and answered but not specifically, Your Honor.

THE COURT: Well, okay, it's been asked and answered, okay? So let's move on to the next question. You already know

the answer to that question.

BY MR. HAYNES:

**Q** What's the address of the place, Global Tours. Address?

**A** 8200 Wilcrest Drive.

02:51:19 **Q** And what was the address of US Tours and Remittance?

**A** Yes. 8200 Wilcrest Drive.

**Q** That was US Tours, too?

**A** Different suite.

**Q** It was a different street than where Global Tours was?

02:51:42 THE COURT: Suite. Suite.

THE WITNESS: (In English.) Different suite.

THE COURT: Different suite.

BY MR. HAYNES:

**Q** It's a different suite?

02:51:49 **A** Yes.

**Q** Oh, it's in the same building, though?

**A** Yes.

**Q** And does -- and while you've been locked up, has your wife -- has the lady you've been living with, the mother of your children, been running Global Tours?

02:52:00

**A** That's correct.

**Q** And does Global Tours use the same phone number as US Tours and Remittance has had?

**A** That's correct.

02:52:24 **Q** And did you get any permission in writing from Mr. Dong

Huynh for you to do that?

MR. VARNADO: Your Honor, again, what is the relevance of this to this proceeding?

MR. HAYNES: You don't understand the relevance of that counsel, then I apologize.

02:52:44

MR. VARNADO: Object to the side bar.

THE COURT: Sustained.

BY MR. HAYNES:

**Q** Did you take the computer from US Tours without permission?

02:52:55

MR. VARNADO: Asked and answered.

MR. HAYNES: Without permission. It has not been answered.

MR. VARNADO: He said he took one computer, Your Honor.

02:53:00

MR. HAYNES: Without permission?

MR. VARNADO: Everybody heard that.

MR. HAYNES: Without permission? If they'll stipulate, I'll --

THE COURT: One computer. You said "computers." One computer.

02:53:11

BY MR. HAYNES:

**Q** One computer without permission?

**A** No.

**Q** Who gave you the permission to take the computer?

02:53:19

**A** Nobody.

**Q** If nobody gave you permission, then you took it without permission, didn't you?
**A** Yes.
**Q** The answer is "yes"?
02:53:38 **A** Well, I took that computer but it has no value.
**Q** I apologize to you, sir. I'm not asking if it had value.
**A** But I would say I want to tell you why I took it.
**Q** Well, you took it to use it in your new business, the Global Tours, didn't you?
02:54:02 **A** That's correct.
**Q** All right. You have learned, have you not, Mr. Huynh, that Alan Golbert was a cooperating witness at the time for the federal government?
**A** Yes.
02:55:05 **Q** And did -- did you at the request of Mr. Golbert try to take a lot of money to Canada?
MR. VARNADO: Objection, Your Honor. This question has been asked and answered --
THE COURT: Sustained.
02:55:24 MR. VARNADO: -- several times as well.
BY MR. HAYNES:
**Q** Were you successful in trying to take money for Alan Golbert to Canada?
**A** No.
02:55:57 MS. PHAN: May we have a moment to conference?

THE COURT: You may.

(Discussion off the record between Mr. Haynes and Ms. Phan.)

BY MR. HAYNES:

02:56:43
**Q** Mr. Huynh, you told counsel for the prosecution, this gentleman, that you created a lot of receipts. Do you recall saying that?
**A** What kind of receipt?
**Q** What kind of receipts did you tell the prosecutor that you prepared while you were an employee of US Tours and Remittance?
02:57:18

MR. VARNADO: Object to the question as vague.

THE COURT: Sustained. Rephrase.

MR. VARNADO: If there's a specific receipt, inquire into it.

02:57:29
BY MR. HAYNES:

**Q** You asked what kind of receipts?
**A** Correct.
**Q** Receipts for money received.
**A** What kind of receipt? All the receipt was prepared by the company.
02:57:48
**Q** Didn't you prepare -- fill in some blanks to show what people had deposited with US Tours? Do you know what I'm talking about?
**A** I don't understand the question.
02:58:12
**Q** Okay.

MR. HAYNES: Let me have that book.

If I may approach the witness, Your Honor?

THE COURT: You may.

BY MR. HAYNES:

**Q** Let me show you another little book that was shown to you by the prosecution, I think, that has little receipts in it. Take a look --

MR. MAGLIOLO: Just for the record, can we get some identification on this?

MR. HAYNES: Sure. Whatever it is.

MR. VARNADO: It's from Government's Exhibit 13B1.

THE COURT: All right.

BY MR. HAYNES:

**Q** Is that a receipt?

**A** Correct.

**Q** And did you prepare it?

**A** Correct.

**Q** That's the receipt I'm talking about, sir.

**A** Now I understand.

**Q** Now you understand?

**A** Yes.

**Q** Before, what kind of receipt did you think I was talking about that you didn't understand? What other kind of receipt did you prepare?

**A** Your question is too general.

**Q** Sure.
**A** Because in office, I receive a lot of money from different customer.
**Q** Sure.
02:59:25 **A** Two kind of receipts: small amount and big amount of money. That's why I need accurate question about what kind of money, what amount of money.
**Q** Okay. Other than receipts for money, what other kind of receipts did you prepare, sir?
02:59:57 **A** The only receipt that I prepare is -- depends on the amount of money.
**Q** Okay. So the only receipts that you prepared while you were at US Tours was receipts for money?
**A** Correct.
03:00:19 **Q** Big money and small money?
**A** Correct.
**Q** And the big money, you sent a -- you sent by e-mail the report to Uncle Dong, is that what you told us?
**A** Always like that.
03:00:47 **Q** And the little amounts, you sent by e-mail to Mr. Sinh?
**A** Correct.
**Q** That's all the questions I have of you, sir.
MR. VARNADO: No further questions, Your Honor.
THE COURT: All right. You may step down.
03:01:09 MS. PHAN: Your Honor, at this time I'd like to make a

verbal objection that all the witness -- just for the record that all --

THE COURT: Let's wait. I'm going to release the jury; then you can make the objection, okay?

03:01:23 Ladies and gentlemen, remember my instructions: Don't talk about the case with each other or with anybody else.

Oh, you have another witness?

MR. VARNADO: We do have another witness, Your Honor.

THE COURT: Okay. Approach the bench then, please.

03:01:32 We got another 26 minutes.

SPECIAL AGENT CHIUE: Your Honor, may I take all these --

THE COURT: Yes. Please do. Please do.

(At side bar.)

03:04:38 THE COURT: What's your objection?

MS. PHAN: Your Honor, my objection is that at this time I'd request that -- from our ongoing objection before, that all of the -- the Court instruct the jury to disregard and strike all the witnesses' testimony who are not indicted in this 03:04:56 case and who has not been named as unindicted co-conspirators in any documents.

MR. VARNADO: Which has no basis in law whatsoever as unindicted co-conspirators under any 5th Circuit law.

MS. PHAN: I would just like to reserve that.

03:05:12 THE COURT: All right. Your objection is overruled.

Your objection is overruled.

MR. VARNADO: We expect this witness to be, certainly, very short on direct.

MR. MAGLIOLO: Yeah. The Government's will be ten minutes, Your Honor, at the most.

MR. VARNADO: He has a plane this afternoon. You know, we'll do -- anyway, that's why we were hoping to --

THE COURT: You're just casting bait.

MR. MAGLIOLO: I understand, Your Honor.

THE COURT: You're just casting bait.

MR. MAGLIOLO: I understand, Your Honor. I understand.

THE COURT: The last 12-minute witness took 51 minutes for cross.

MR. MAGLIOLO: I understand.

THE COURT: You realize that?

MR. MAGLIOLO: I understand, Your Honor.

THE COURT: Four times as long.

MR. MAGLIOLO: I understand.

THE COURT: All right. I don't think -- I think he better make some more reservations because, you know --

MR. MAGLIOLO: I understand.

THE CASE MANAGER: One of the jurors is trying to get your attention.

(Side bar concluded.)

03:06:08

THE COURT: One of the jurors needs to talk to me about something?

A JUROR: No.

THE COURT: Just standing up and stretching? All right.

MR. MAGLIOLO: The United States calls Special Agent Wu, Your Honor.

(The witness, **WILLIAM WU**, called on behalf of the Government, was sworn.)

03:06:12

DIRECT EXAMINATION

BY MR. MAGLIOLO:

**Q** Please state your name for the Court, the court reporter, and the ladies and gentlemen of the jury.

**A** My name is William Wu. Last name spelled W-u.

03:03:54

**Q** How are you employed?

**A** I'm a special agent with the FBI.

**Q** How long have you been a special agent with the FBI?

**A** Seven years.

**Q** Just briefly, what's your current assignment?

03:04:06

**A** National security matters.

**Q** And where is your assignment?

**A** San Francisco.

**Q** Direct your attention back to November -- I'm sorry, to March 31, 2004, and ask you were you working as an FBI special agent on that day?

03:04:25

**A** Yes, I was.
**Q** And where were you working?
**A** I was working in San Francisco.
**Q** And based on your job as an FBI special agent, did you come in contact with a person you came to know as Dong Huynh?
**A** Yes, I did.
**Q** Do you see him sitting in the courtroom today?
**A** Yes, I do.
**Q** Could you identify and point to him and describe an article of his clothing so the court reporter can get it in her record.
**A** Mr. Huynh is sitting at the table on my right side wearing glasses and a dark jacket.

MR. HAYNES: We'll stipulate it's Mr. Huynh, Your Honor.

THE COURT: All right. The record will reflect that's Mr. Huynh.

BY MR. MAGLIOLO:
**Q** What caused you to come in contact with Mr. Huynh?
**A** We have an arrest warrant for Mr. Huynh.
**Q** And would that be the arrest warrant out of this case that's on trial before this jury today?
**A** Yes, sir.
**Q** Would you explain to the jury how you executed that arrest warrant.
**A** We conducted surveillance prior to the arrest warrant and

showed up at his place of employment and put Mr. Huynh under arrest.

03:05:33

**Q** And was -- did Mr. Huynh fight you or cause you any kind of trouble?

**A** No.

**Q** In fact, was he initially cooperative?

**A** He was.

**Q** And what's the first thing you do after you place somebody under arrest?

03:05:39

**A** We gave him the advice of rights.

**Q** And explain briefly to the ladies and gentlemen of the jury what that is.

03:05:56

**A** We explained to Mr. Huynh that he does not have to speak with us, he has the right to his attorney, anything that he said can be used against him; and we told him that any time he decide to stop the interview, he can stop at any time.

**Q** And was that explained to him in both English and Vietnamese?

**A** Yes, sir.

03:06:08

**Q** And did he sign a form in Vietnamese indicating that he understood his rights and he would give up his rights and visit with you guys a little bit?

**A** Yes, sir, he did.

03:06:21

**Q** And did you participate in the conversation with this Defendant after he waived his rights?

03:06:33

**A** Yes, I did.
**Q** And did he explain to you who he was and what he did for a living?
**A** Yes, he did.
**Q** And what did he tell you?
**A** He told me that he's the president and CEO of US Tour and US Tour Remittance, Incorporated.
**Q** And did he indicate to you whether or not he had -- he had had that job from the inception of the company or he had come on sometime later?
**A** He told me that he is just owner and CEO of US Tour since its inception in 1997.
**Q** And did he explain to you what the company's purpose was?
**A** Yes, he did.
**Q** And what did he tell you it was?
**A** US Tour is a traveling agency and US Tour Remittance, Incorporated, is a financial remitting -- money remitting company, service exclusively to Vietnam.
**Q** And did he explain to you if he had any personal relationship with anybody or anything in Vietnam, if you recall?
**A** I'm sorry. He said he does not have a working relationship -- he does not have anyone over in Vietnam, but he -- his company works with the Bank of Saigon, a working relationship.
**Q** And did he indicate to you at that time that he had a brother who he worked with in Vietnam?

**A** No, he did not.
**Q** Did you give him an opportunity to tell you that, that he had someone that he worked with specifically in Vietnam when he transferred the funds?
03:08:04 **A** It was an open question. Basically, we put what Mr. Huynh told us.
**Q** Did he explain how many different offices he had?
**A** Yes, he did.
**Q** And did he tell you whether or not the managers of each and
03:08:18 every office except one was a relative of his?
**A** Yes, he did.
**Q** Did he -- you-all talk about whether or not US Tours was a financial institution or not?
**A** Yes, he did.
03:08:31 **Q** And what did he tell you?
**A** He told me that US Tour is a financial institution.
**Q** Did you talk about whether or not he understood the laws relating to financial institutions?
**A** He told me that.
03:08:43 **Q** And specifically, what did he tell you that he understood to be the laws relating to financial institutions?
**A** He told me that the first step of anyone remitting money would be an application -- to fill out an application with US Tour. He told me that if the amount is under $3,000, an
03:09:08 application is sufficient. Any amount over $3,000, a Social

Security number and some form of identification is required for the transaction. And he told me if the remitting amount is over $10,000, a currency transaction report needs to be filed.
**Q** So it was clear to you that he understood that if the amounts were over $10,000, he had to get relative identification information from the person bringing in the money and that a CTR should be filed?
**A** Correct.
**Q** At some point during the interview, did you change the interview place from his place of business to your office downtown?
**A** Yes, we did.
**Q** And why did you-all do that?
**A** As Mr. Huynh request, he did not want to be seen at his business location that he was being interviewed by FBI agents.
**Q** When you arrived at the -- was it at your office downtown?
**A** Yes, sir.
**Q** And this is where?
**A** 450 Golden Gate Avenue on the 13th floor in San Francisco.
**Q** At that -- at that location, did you specifically ask the Defendant if he had any contacts in Canada?
**A** Yes, we did.
**Q** And what was his initial answer?
**A** No. He stated that he did not have any contact.
**Q** And based on your knowledge, did you believe that to be

true or not true?

**A** Not true, sir.

**Q** Did you specifically ask him about a particular person in Canada that you believed you had evidence that he had a relationship with? Did you direct him to that specific person?

03:10:44

**A** Yes, I did.

**Q** Even though he had told you he had no contacts in Canada?

**A** Correct, sir.

**Q** And what was his response about that specific person?

03:10:56

**A** He was aware of a person named Andy. And Andy is in the similar business, money remittance business, in Canada and that Andy would like to form business partnership with Mr. Huynh and Mr. Huynh has -- had met with Andy and decided not to be partner of Andy.

03:11:26

**Q** Okay. So first, he denies having any contacts in Canada and then when you bring up Andy --

MR. HAYNES: Repetitious, if the Court please. Asked and answered.

THE COURT: Overruled.

03:11:37

BY MR. MAGLIOLO:

**Q** And then, when you bring up Andy, he admits to knowing Andy, correct?

**A** Correct.

**Q** Did you again give him an opportunity to tell any other contacts, particularly, business contacts, that he had in

03:11:46

03:11:54

Canada?
**A** Correct, I did.
**Q** And what was his response the second time?
**A** He denies having any other contact.
**Q** And after being pushed on this Canadian contact business --
MR. MAGLIOLO: Okay. Let me strike that, if it please the Court.
BY MR. MAGLIOLO:
**Q** So when asked again, he said -- he again said he had no other contacts in Canada; is that correct?
**A** Correct.
MR. MAGLIOLO: If I might have a moment, Your Honor?
We pass the witness, Your Honor.
THE COURT: All right.

CROSS EXAMINATION

BY MR. HAYNES:
**Q** Mr. Phu --
THE COURT: Wu.
BY MR. HAYNES:
**Q** Or Wu, excuse me. Mr. Wu, you and I have not had a chance to talk with each other before, have we, sir?
**A** No, sir.
**Q** I take it, though, that you had an opportunity to talk to my learned co-counsel here for the prosecution, Mr. Joe Magliolo?

**A** Yes, I did.
**Q** On more than one occasion?
**A** Twice, sir.
**Q** And when was the most recent time?
03:12:49 **A** This morning.
**Q** And what length of time did you have to spend with him this morning?
**A** A few minutes, sir.
**Q** I beg your pardon?
03:12:57 **A** A few minutes.
**Q** And before this morning?
**A** Yesterday afternoon, sir.
**Q** Afternoon. How long did you get a chance to spend with him yesterday afternoon?
03:13:10 **A** A few minutes.
**Q** A few minutes?
**A** Yes.
**Q** Any other meetings with him prior to yesterday afternoon and this morning?
03:13:14 **A** No, sir.
**Q** By telephone conversations, have you conferred with him?
**A** No, sir.
**Q** Have you conferred with the special agent, Mr. John Chiue, with reference to this case?
03:13:20 **A** Yes, sir.

03:13:41 03:13:51 03:14:02 03:14:24 03:14:35

**Q** How many times with reference to this case, sir?
**A** More than five; less than ten.
**Q** And did you, as a consequence of those more than five, less than ten telephone -- were they telephone conversations?
**A** Yes, sir.
**Q** Did you create a report of any kind reflecting anything regarding the nature of those conversations?
**A** No, sir.
**Q** Did you, as a consequence of your involvement in this litigation, prepare any documents of any kind reflecting your activities and observations?
**A** I --
**Q** I'm sorry. Can you answer that "yes" or "no," sir?
**A** Yes, sir.
**Q** And where are those documents that you prepared?
**A** I reprinted my previously written documents.
**Q** Reprinted them, sir?
**A** Yes, sir.
**Q** And I apologize to you, I'm not following you exactly as to what you're saying. You had created them and printed them and then you reprinted them?
**A** I -- reprinted what I wrote before, yes, sir.
**Q** All right. Do you have a copy of what you wrote before with you, sir?
**A** I have a working copy, yes.

**Q** Does it contain all the notes and records and memos that you prepared with reference to your activities in connection with this case?
**A** No, sir.
03:14:44 **Q** Is there yet another larger file reflecting your activities and observations?
**A** Yes, sir.
**Q** And have you provided it for the prosecution in this case?
**A** Yes, sir.
03:15:00 **Q** Have you had a chance to look at it to review your memory, refresh your memory, about the events depicted therein?
**A** I review my working document, my 302s, my reports.
**Q** All right. Now, you said that you were involved in the case in California. Were you involved as a matter of
03:15:23 surveillance or as a matter of investigatory contact work?
**A** Both, sir.
**Q** All right. Directing your attention to the latter part of it, investigatory contact, had you before the time that Mr. Dong Huynh was arrested had any personal exchange with anybody else
03:15:47 involved in the investigation? Not a member of the FBI, of course.
**A** Yes, sir.
**Q** All right. And who had you interviewed or examined or arrested?
03:15:54 **A** No. I -- that's not what I meant, sir.

**Q** I'm sorry.
**A** I exchange information with DEA Agent Laurie Miller.
**Q** All right. Now, when you say you exchanged information, Ms. Laurie Miller of the DEA sent you information?
**A** I assisted her in her investigation.
**Q** And then you sent her information?
**A** We talk on a daily basis.
**Q** Did she invite you into the investigation or vice versa?
**A** She invite me into investigation.
**Q** All right. And she was located -- Ms. Laurie Miller was located where at the time she was investigating?
**A** Oakland, California, sir.
**Q** And did you open a file as a consequence of your request from Agent Laurie Miller?
**A** Yes, I did.
**Q** What was the date that you opened the file?
**A** I do not recall that, sir.
**Q** Do you have an idea as to the year?
**A** 2004.
**Q** And do you have that file with you, sir?
**A** No, I don't, sir.
**Q** Were you instructed by anyone to bring it with you or --
**A** No, sir.
**Q** -- vice versa?
**A** No, sir.

**Q** Have you before as an agent with the FBI have occasion to testify in court?
**A** That's true.
**Q** And have you -- is it your experience that when you're called upon to testify in court concerning investigatory activities that you are to bring your file with you?
**A** No, sir.
**Q** Wouldn't it be helpful to you -- if you had your file, you could look at it and refresh your memory as to dates and events?
**A** I review my 302s.
**Q** Sir?
**A** I review my 302s.
**Q** You have reviewed your 302?
**A** Yes.
**Q** And do you have it with you?
**A** My working copy of the 302, yes, sir.
**Q** All right. When you first got involved -- you said you got involved in 2004. Do you have any idea and will your 302 permit you, upon inspection, to know when in 2004 you got involved at the request of the DEA agent, Miller?
**A** No, sir.
**Q** Would your examination of your 302 permit you to know, upon review, when it was that you took your first activity in connection with the request by the DEA in California to look -- to help in the case?

A I do not recall that, sir.
Q What was the first activity that you participated in as an FBI agent assigned to this case that you had been working on since 2004?
03:18:29 A I conduct surveillance at one of the US Tour location.
Q All right. You were on a surveillance team?
A Yes, sir.
Q And when did that surveillance start, sir?
A I do not recall that, sir.
03:18:47 Q Did it start in 2004 when you got the call?
A I did not recall that, sir.
Q 2005?
A Not 2005.
Q 2006?
03:19:02 A Not 2006.
Q Seven?
A Not 2007.
Q This year, eight?
A No, sir.
03:19:14 Q Before you got the call?
A I'm sorry?
Q Sure. The call from the DEA agent that asked you to participate in the surveillance and activities.
A It was in 2004.
03:19:23 Q Yes, sir. And did you participate before that --

**A** No, sir.
**Q** -- in connection with this case.
Directing your attention to the surveillance that you performed, the date of which you cannot recall, upon whom
03:19:35 did you perform this surveillance?
**A** It was -- it was at US Tour location.
**Q** At the US Tours location?
Now, did you do that surveillance by yourself, Agent Wu, or did you work with some other agent?
03:19:59 **A** I work with some other agent, sir.
**Q** And what other agent was your companion at the time?
**A** Laurie Miller from DEA, Earl Assauto from the FBI.
**Q** I'm sorry, what was the name?
**A** Earl Assauto.
03:20:19 **Q** Okay. And you did surveillance on the US Tours location with Laurie Miller of the DEA and Mr. Assauto of the FBI?
**A** Correct, sir.
**Q** And did the three of you separate from the official vehicle you were in in order to observe the US Tours location, which is
03:20:38 what you said you had under surveillance?
**A** Correct.
**Q** And so the three of you from the same car watched the US Tours location?
**A** Not from the same car.
03:20:46 **Q** You-all were in three different vehicles?

A Correct, sir.
Q All right. And did you notice anybody coming or going from the US Tours location at a date you now cannot remember and can't tell our jury that you thought of significance enough to put in a report? Just "yes" or "no," if you can, agent.
A Yes.
Q All right. What name did you see coming in and out of the US Tours office that you thought significant enough to put in the report?
A We don't have a name.
Q I'm sorry, I thought you had a name. I apologize to you.
A No, sir.
Q Do you have a picture?
A No, I don't.
Q Do you have a written description of the human being that you say you thought was important enough to put in the report?
A It was a Houston --
Q I apologize to you. Do you have a description because I can't think of any description that would start off with Houston?
A No, sir.
Q And you had information then to the effect that the person you had some interest in was from Houston?
A Correct, sir.
Q And that information came to you by way of some

03:22:03 03:22:18 03:22:29 03:22:44 03:22:52

communication from some Houston office?
**A** Correct, sir.
**Q** And was it written communication?
**A** Yes, sir.
**Q** And do you still have a copy of it in your file?
**A** We have that in our file, yes, sir.
**Q** No. You said "We have that in our file." Do you have it in your file since you were one of the recipients of it and you acted in response to it?
**A** Yes, sir.
**Q** Do you remember the date?
**A** No, sir.
**Q** Well, did the Houston file give you a name?
**A** No, sir.
**Q** Give you a description of a human being?
**A** It was a cooperating witness from Houston office.
**Q** A cooperating witness from the Houston office?
**A** Correct.
**Q** All right. And do you recall, did they ever give you the name of the cooperating witness?
**A** No, sir.
**Q** Did you ever call the Houston office to determine the name of the cooperating witness?
**A** No, sir.
**Q** They simply advised you that a cooperating witness would be

at the US Tours office on a particular day?
**A** No, sir.
**Q** What US Tours office did you do surveillance on that we're talking about? What city were you in?
03:23:09 **A** San Francisco.
**Q** And did the -- did the cooperating witness that you had been -- talked about from Houston, did that person show up?
**A** Yes, sir.
**Q** And did that person make himself known to you by some
03:23:30 signal or flag or demonstration or otherwise?
**A** We met prior to the surveillance, sir.
**Q** Sir?
**A** We met prior to the surveillance.
**Q** By orchestration out of Houston? In other words, was it
03:23:42 arranged by the Houston office?
**A** Correct.
**Q** And so you met with this cooperating witness?
**A** Correct.
**Q** And did you determine that the cooperating witness at the
03:23:52 time had been a person who was convicted of a federal felony in Houston, Texas, before he became a cooperating witness?
**A** I do not know that, sir.
**Q** That wasn't made known to you at the time they told you he was a cooperating witness?
03:24:09 **A** Could be.

**Q** I'm sorry?
**A** Could be.
**Q** You say "could be," meaning you could have known but you now do not recall specifically?
03:24:18 **A** Not necessarily, sir, that's all.
**Q** Sir?
**A** The cooperating witness could have been a person been convicted of a felony, but that's not necessarily the case.
**Q** But in this case did you have any clue, tip, iota, top, 03:24:35 side, or bottom, that the man you were meeting that you referred to from Houston was a convicted felon who was cooperating then with the Government?
**A** I do not have that knowledge, sir.
**Q** Did you learn after the time of the meeting you had for the 03:24:49 first -- the first time with this man that he was, in fact, a convicted felon cooperating with the Government?
**A** I did not know that, sir.
**Q** Did you make inquiry of him?
**A** No, sir.
03:25:00 **Q** Was the interview with him -- as you reported to us, was that interview with that cooperating witness monitored in some way, by tape recording, videotape?
**A** Not videotape.
**Q** Was there a tape recorder which captured the interview?
03:25:19 **A** Interview with me?

03:25:33

03:25:43

03:25:50

03:26:09

03:26:20

Q With the cooperating witness.
A Was it monitored?
Q I thought that was my question, sir.
A I'm just trying to clarify your question, sir.
Q Sure. Appreciate it.
A Yes, sir.
Q It was monitored?
A It was monitored.
Q Okay. By that was it videotaped?
A No, sir.
Q Audiotaped?
A It was a picture.
Q A picture?
A Yes, sir.
Q You mean it was a movie picture taken of the exchange?
A No, sir. He has money and we took picture of the money.
Q Okay. So when you say you took pictures of the money --
A Yes, sir.
Q -- did you take pictures of him?
A No, sir.
Q Was there any recording made of the exchange, that is, what was said by him and what was said by the officers?

MR. MAGLIOLO: Excuse me. We object, Your Honor. That's been asked and answered.

THE COURT: Sustained.

BY MR. HAYNES:
**Q** I take it that there was nothing other than the pictures of the money?
**A** Correct, sir.
03:26:30 **Q** And that was before the time that you went over to watch US Tours?
**A** Correct.
**Q** Now, when you got to US Tours, did you get to park your vehicle in a position where you could see inside the office of US Tours?
03:26:41
**A** Some part of the inside, yes, sir.
**Q** And were you able to focus any sort of photographic equipment on that part of the US Tours office to see if, in fact, your cooperating witness went to that location?
03:26:57 **A** No, sir.
**Q** Did any of your officers go into US Tours before the time of the surveillance to determine its layout, to see how it's configurated, to see where you might be able to stand to see what you would be able to see or could see?
03:27:14 **A** Yes, sir.
**Q** All right. Who went into the US Tours office to check it out?
**A** I do not recall that, sir.
**Q** It wasn't you?
03:27:21 **A** No, it was not me.

03:27:37

**Q** Was it the DEA lady?
**A** I do not recall that, sir.
**Q** Or Assauto?
**A** I do not recall that, sir.
**Q** Okay. You just know that it's protocol when you're going to do a surveillance on a location like that under these circumstances to try to get an officer inside of the facility so you can check it out to see where the exits are and the openings and how it's configurated?
**A** No, sir.
**Q** That's not part of the protocol?
**A** No, sir.

MR. MAGLIOLO: Judge, we object to what the protocol is --

THE COURT: Sustained.

MR. MAGLIOLO: -- to be relevant to what happened in this case, Your Honor.

MR. HAYNES: Well, if the Court please, if they deviated from protocol, that might be relevant if there's a reason for it.

THE COURT: I cannot imagine how that would be relevant.

MR. HAYNES: If there was a reason.

THE COURT: Just --

MR. HAYNES: I can show the Court --

THE COURT: Ask the next question, please.
MR. HAYNES: I will.
BY MR. HAYNES:
**Q** When -- all right. Now all this officer going in took place before this surveillance started or after the surveillance started?
**A** Before the surveillance, sir.
**Q** All right. How long were you there at -- in front of the US Tours that day?
03:28:30 **A** I do not recall that, sir.
**Q** Were you there when, in fact, the cooperating witness showed up and went inside US Tours?
**A** Yes, sir.
**Q** Did you participate in determining whether or not the cooperating witness had a recording device on him or her to record what was being said by anybody inside, if anything was said?
**A** Yes, sir.
**Q** And did you check it before he went in?
03:28:55 **A** Yes, sir.
**Q** And was it -- did it have a beginning on it wherein you put your voice and indicated that you were starting the tape so that you could understand and augment later on when the tape started?
**A** I witnessed that, sir.
03:29:10 **Q** Are you on the tape at the beginning of it or you just

witnessed it?
**A** I witnessed it.
**Q** All right. So did you witness the tape being taken off the man after the time he came back from inside US Tours?
03:29:22 **A** Yes, sir.
**Q** Did you participate in determining whom, if anybody, this man had talked to in the San Francisco area of US Tours?
**A** No, sir.
**Q** Who was the agent who participated in the post-surveillance
03:29:44 examination of this cooperating witness? Was it you?
**A** No, sir.
**Q** Do you know of your own personal knowledge what agents it was? Who participated in the post-surveillance investigation or inquiry of the cooperating witness? Somebody did, right?
03:30:08 **A** Post-surveillance?
**Q** Yeah. After the surveillance is over, after you get through watching US Tours, the guy comes out, he somehow gets in his car or goes to some predetermined place and you get to talk to him. The surveillance is over. It's a post-surveillance
03:30:23 examination. Have I made myself clear?
**A** Yes, sir.
**Q** That's the way we operate, the FBI -- or did, don't we? Isn't that protocol?
THE COURT: That's just a rhetorical question.
03:30:34 just --

MR. HAYNES: That is. When I was in --
THE COURT: -- ask the question again please. Just ask him a question.
BY MR. HAYNES:
03:30:41 **Q** Did you participate in the post-surveillance interrogation of the cooperating witness?
MR. MAGLIOLO: Asked and answered, Your Honor.
THE COURT: Overruled.
BY MR. HAYNES:
03:30:53 **Q** Just "yes" or "no?"
**A** Yes, sir.
**Q** And did you manage to get a description of the person with whom the cooperating witness had had some exchange with inside US Tours?
03:31:04 **A** No, sir.
**Q** Did the cooperating witness give a description of the person with whom he or she had had an exchange with inside US Tours?
**A** Not to me, sir.
03:31:18 **Q** Well, to any other officer in your presence?
**A** I do not know that, sir.
**Q** Well, in the 302 that you brought with you that you used to refer to and refresh your memory, does it say whom it was that the cooperating witness did business with inside US Tours?
03:31:38 MR. MAGLIOLO: We object to the form of the question,

Your Honor. Counsel well knows what -- he has all the 302s. He knows exactly what's in the 302s, and we object to the form of the question, Your Honor.

MR. HAYNES: I'm entitled to ask questions on cross examination --

THE COURT: Okay. Let's approach the bench please.

MR. HAYNES: -- any way I like, Judge.

THE COURT: Approach the bench, please.

(At side bar.)

THE COURT: It's 3:30. We have to break. You've been asking him about not what he testified about but about some other thing. And you're asking him about the 302 that he used to refresh his memory; and he's told you more than once he's refreshed his memory concerning his testimony, not concerning the first incident he was on in this investigation.

MR. HAYNES: He didn't say that.

THE COURT: Yes, he did. Yes, he did. So I just don't think we're getting anywhere on this. Are you going to ask him about every single surveillance he was on in this case?

MR. HAYNES: No. Just this case.

THE COURT: Just --

MR. HAYNES: Just what he testified to on direct.

MR. VARNADO: He didn't testify anything about that.

THE COURT: You haven't asked him a single question about what he testified on direct, not one.

03:35:50 03:36:02 03:36:18 03:36:28 03:36:32

MR. HAYNES: He hasn't made the protocol yet, Judge. I'd be remiss in my obligation.

THE COURT: Mr. Haynes, I am getting -- I guess you can probably tell that I am getting extremely impatient with this. I know that this is your MO. I know this is what you've been doing for God knows how many years.

MR. HAYNES: I have an obligation to this Court.

THE COURT: And I think that it probably worked for you really well, but I really don't have enough time in the universe for you to do the kind of things you do. So I think I'm going to have to break. This man is going to have to not make his plane. He's going to have to come back here in the morning, and you're going to delay and go into it more.

But I'm telling you, I'm going to cut it off at some point because this is really getting out of control. I'm just telling you.

MR. HAYNES: All I want is the facts, Judge.

THE COURT: Yeah. The facts about, you know, when his mother's water broke? Is that what you --

MR. HAYNES: I don't care about that.

THE COURT: Yeah, okay.

MR. HAYNES: Just the protocol by virtue of the manual. I've read the manual. I know the manual. I worked with the FBI.

THE COURT: We're not going to talk about protocol.

MR. HAYNES: Oh, all right.

THE COURT: Okay? It's not relevant to this case at all and certainly not to his testimony.

MR. HAYNES: If they breached it --

03:36:40 THE COURT: Oh, would you stop it. Just stop it. You think I'm an idiot.

MR. HAYNES: No, I don't.

THE COURT: I am not an idiot. I'm just not putting up with this, okay? I'm just not going to tolerate any more of 03:36:54 this.

MR. HAYNES: Well, don't -- Judge, you're too good a judge and too much of a champion to take up for the prosecution.

THE COURT: I'm not taking up for anybody. I'm taking up for the jury.

03:37:00 MR. HAYNES: All right, I agree with that.

THE COURT: I'm taking up with the jury, not the prosecution.

MR. HAYNES: All right. I'll go along with the Court on that.

03:37:06 THE COURT: All right.

(Side bar concluded.)

THE COURT: All right, ladies and gentlemen, we're going to break for the day. Remember my instructions: Don't talk about the case with each other or with anybody else. Don't 03:34:30 read anything about the case, watch anything about the case, or

03:34:40 03:34:51

listen to anything about the case.

You got to hear my instructions. I know you're anxious but you got to hear them.

Don't -- if anybody comes up to you wants to talk to you about the case, tell them you can't, talk to Ms. Tippen. Don't do any independent research or investigation. Keep an open mind until you've heard all the evidence.

We'll see you back at 9:00 o'clock in the morning.

(Court recessed for the day at 3:34 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, to the best of my ability.

By: /s/*Gayle L. Dye* *09-10-2009*

Gayle L. Dye, CSR, RDR, CRR Date